UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------------X

RACHELI COHEN, and additional plaintiffs listed on
Rider A,

                       Plaintiffs,

             -against-

FACEBOOK, INC.,

                   Defendant.

--------------------------------------------------------------------X

Docket No:

16-cv-4453 (NGG) (lb)

**AMENDED COMPLAINT**

      Plaintiffs, complaining of the Defendant, by their attorneys, THE BERKMAN LAW

OFFICE, LLC, allege for their Amended Complaint as follows:

## **INTRODUCTION**

      1.     This is an action against Facebook, Inc. ("Facebook") for an injunction barring

Facebook from continuing to aid Palestinian terrorists who incite, threaten, and carry out violent

attacks against Israeli citizens using its social media platform and services. Plaintiffs are 20,000

Israelis who, since October 1, 2015, have been living in the crosshairs of a murderous terrorist

rampage carried out by terrorists who attack people with knives, guns, axes, screwdrivers, cars,

and Molotov cocktails for no reason other than that the attacker perceives the victims to be

Jewish ("Terror Attacks"). Many of these attackers and murderers have been motivated to

commit their heinous crimes by terrorist incitement and the glorification of violence against

innocent civilians directed at them by terrorists using Facebook—demagogues and terrorist

leaders exhorting their followers to "slaughter the Jews," and offering instruction as to the best

manner to do so, including even anatomical charts showing the most effective places to stab a

human being. In this matter, Defendant is far from a neutral, innocent internet platform that does not know that it is providing valuable services to terrorists. Just as Facebook's algorithms draw and direct customers to retailer's Facebook pages, Facebook's algorithms also draw and direct followers and potential recruits to terrorists' Facebook pages. Facebook has knowingly permitted designated terrorists to maintain Facebook pages, and it often refuses to shut down terrorist pages even when they are filled with threats of terrorism and incitement to murder. In fact, Facebook actively assists the terrorist inciters to find people who are interested in their hateful messages. By brokering connections between terrorist inciters (including recognized terrorist organizations) and potential followers, recruits, rank-and-file terrorists and violent criminals, Facebook is furthering the terrorists' goals. Just as "fighting words" are not protected speech, supporting terrorism is not protected conduct. Facebook's conduct is indefensible and must be ended.

2.      Many of the terrorists who have attacked Israelis over the last several months were responding to other terrorist's inciting posts on Facebook calling on them to slaughter Jews and providing detailed instructions on "how to" do so. Some of the terrorists announced their intentions on Facebook just before going out to attack, making statements like "I want to become a martyr," and "the Third Intifada has erupted." These attackers have been glorified *en masse* as martyrs by terrorist groups and leaders using Facebook, thereby inspiring numerous others to follow in their footsteps.

3.      Facebook gathers data about its users, and has the technical ability to monitor the material that appears on users' Facebook pages. Instead of using that data to actively direct those who are most interested in carrying out Terror Attacks to the terrorists' incitement that will lead them to their goal, and instead of introducing the terrorist inciters to people who are interested in

murder, Facebook should be held accountable to remove terrorist threats and incitement immediately upon being posted, cease making such introductions, and shut down the Facebook accounts of recognized terrorist organizations and terrorists.

## THE PARTIES

4.     The plaintiffs are approximately 20,000 Israeli citizens living in Israel, who have been and continue to be targeted by a campaign of incitement to murder carried out and promoted through Facebook by Palestinian terrorists intent on carrying out Terror Attacks.

5.     All of the plaintiffs reside in Israel and are presently threatened with imminent violent attacks that are planned, coordinated, directed, and/or incited by terrorist users of Facebook with the knowing and intentional support and assistance of Facebook. Each of the plaintiffs fears for his life and safety as well as the lives and safety of their families and neighbors. The threat of being killed or seriously injured in terrorist attacks has spread to every sector of Israeli society.  Barely an hour goes by in Israel without the report of another attack or attempted attack against civilians. So pervasive is the fear of terrorist attacks that few Israelis venture outside of their homes, schools or offices. Schools and colleges across Israel have bolstered security on their buildings and campuses. Moreover, Israel has deployed thousands of additional police offers and border patrol troops in its cities, malls and bus stations. Former army and police officers are being urged to carry weapons with them, and stores that sell civilian self-defense equipment such as pepper spray report being unable to keep up with the massive demand.

6.     Defendant Facebook, Inc. is a corporation organized and existing pursuant to the laws of the State of Delaware, which conducts business throughout the United States and the world, including Israel, and maintains offices in both New York and Israel, and many other

-3-

places. Facebook is subject to the jurisdiction of this Court pursuant to CPLR §§ 301 and 302. Facebook is a public company whose stock is traded on the NASDAQ Exchange in New York with a market capitalization of more than $325 billion. Although Facebook's corporate headquarters are in California, Facebook is registered to do business in New York pursuant to N.Y. Bus. Corp. Law § 1301. As a condition for being authorized to do business in New York, Facebook designated the New York secretary of state as its agent for service of process. Facebook has thus consented to personal jurisdiction in New York.

7.      Facebook has established a major presence in new York, and it's presence, actions, and affiliations in New York are sufficiently continuous and systematic to render it essentially "at home" in New York and subject to jurisdiction. For example, Facebook has multiple offices in New York, including an exclusive 275,635 square foot New York headquarters at 770 Broadway in Manhattan, which was custom-designed and built for Facebook by renouned architect Frank Gehry, as well as 10,850 square feet of additional office space in New York. In addition, Facebook has at least two bank accounts located in the New York, which hold more than $70 million in cash, cash equivalents, and marketable securities. Facebook has more than 1,000 employees in New York, which comprise nearly 5% of its employees worldwide, and it is continuing to grow its New York workforce. Facebook's New York offices include employees in Facebook's Global Marketing Solutions, Technology, and Business Development departments.

8.      Facebook has established an "Engineering Hub" in New York that, among other things, releases daily updates worldwide to the Facebook social media platform and services, and also designs, creates, develops and releases other applications for use with Facebook, particularly in the field of mobile applications. Facebook's New York "Engineering Hub" is directly

-4-

responsible for developing and improving certain Facebook services that are of particular benefit to Palestinian terrorists. For example, Facebook's New York engineers were responsible for recently redesigning Facebook's mobile infrastructure for using Facebook on smartphones with Android and Apple's iOS operations system, and they continue to be responsible for improving the mobile platform and adding new applications. Palestinians terrorists have embraced using Facebook on smartphones, which enables real-time posting of events, remote intelligence gathering, and constant access even when on the move or during electrical blackouts. The New York office has also recently made major enhancements to Facebook's Messenger communications service used by terrorists, including the ability to make payments and transfer cash to other Facebook users.

## JURISDICTION

9.      This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 as the plaintiffs are all citizens of Israel and the defendant Facebook, Inc. is a Delaware corporation that has its principal place of business in California, and the amount in controversy exceeds $75,000 as the value of the injunction sought is in excess of that amount.

10.     This court has personal jurisdiction over the defendant pursuant to CPLR §§ 301 and 302.

## FACTS

### *The 2015-2016 "Facebook Intifadah"*

11.     On October 1, 2015 Palestinian terrorists murdered a young couple, Eitam and Na'ama Henkin, in a brutal roadside shooting attack on their vehicle while they were driving home from a social gathering with their four young sons in the back seat. The next day, a well-known Hamas leader used Facebook to praise the attack as a "heroic operation" and as a "natural

response to the crimes of the enemy," including the "Judaization of al-Aqsa [Mosque]" and what he called the "murder of [a] girl" who had been shot attempting to stab an Israeli soldier. Five Hamas operatives were arrested and charged for the attack.

12.    Beginning with the Henkins' murder, Israel has been plagued with a new wave of Terror Attacks.

13.    Since the beginning of October 2015, more than 30 Israelis as well as a number of non-Israelis have been murdered and more than 400 other Israelis have been wounded in this wave of Terror Attacks.

14.    Many of these Terror Attacks have been carried out by young Palestinian terrorists, with the youngest attacker being just thirteen years old. The weapons of choice for these murders are knives, with axes, meat cleavers, screw drivers, scissors, guns, and cars also being used.

15.    These Terror Attacks have taken place in locations across Israel at various times during the day and night, leading all Israelis to fear for their personal safety and security whenever out in a public place and even in their homes.

16.    Unfortunately, the list of Terror Attacks since October 1, 2015 grows daily.[1] The following is a list of terrorist attacks carried out in just the first month of this ongoing terrorist rampage:

a)    October 1, 2015, Nablus near Samaria – Rabbi Eitam and Naama Henkin murdered in a drive by shooting. The attack was carried out by Hamas operatives.

---

[1]    *See* http://mfa.gov.il/MFA/ForeignPolicy/Terrorism/Palestinian/Pages/Wave-of-terror-October-2015.aspx.

b)      October 3, 2015, Lion's Gate in Old City of Jerusalem – Aharon Banita-Bennet and Rabbi Nehemia Lavi murdered in stabbing attack. Mr. Banita-Bennet's wife and two-year-old son were injured in the attack. The terrorist attacker was a member of the Palestinian Islamic Jihad.

c)      October 4, 2015, Old City of Jerusalem – 15-year-old Jewish student Moshe Malka stabbed and wounded on his way to pray at the Western Wall in the Old City in Jerusalem.

d)      October 7, 2015, Petach Tikvah – Israeli man wounded in stabbing attack at shopping mall.

e)      October 7, 2015, Lion's Gate in Old City of Jerusalem – Israeli man wounded in stabbing attack.

f)      October 7, 2015, Kiryat Gat – Terrorist stabbed Israeli soldier, grabbed his gun and then attacked Israeli woman in her home who managed to flee. The terrorist attacker was a member of Fatah.

g)      October 8, 2015, Tel Aviv – Female Israeli soldier and three others wounded in stabbing attack.

h)      October 8, 2015, Jerusalem – Jewish religious student and another Israeli man injured in stabbing attack at light rail station.

i)      October 8, 2015, Kiryat Arba – Israeli man seriously wounded in stabbing attack.

j)      October 8, 2015, Afula – Israeli soldier wounded in stabbing attack.

k)      October 9, 2015, Jerusalem – 16-year-old Israeli boy injured in stabbing and beating attack.

l)      October 9, 2015, Afula – Attempted stabbing of security guard at Central Bus Station.

m)      October 9, 2015, Kiryat Arba – Israeli police officer stabbed; terrorist attempted to grab his gun. The terrorist was affiliated with Hamas.

n)      October 10, 2015, Damascus Gate in Old City of Jerusalem – Two Israeli men in their 60's wounded in stabbing attack; terrorist then attacked police officers. The terrorist was affiliated with Fatah.

o)      October 10, 2015, Damascus Gate in Old City of Jerusalem – Two Israeli police officers wounded in stabbing attack. The terrorist was affiliated with Fatah.

p)      October 11, 2015, Maaleh Adumim-Jerusalem Highway – Police officer lightly injured in terrorist bombing attack.

q)      October 12, 2015, Lion's Gate in Old City of Jerusalem – Attempted stabbing.

r)      October 12, 2015, Jerusalem – Israeli policeman injured in stabbing attack.

s)      October 12, 2015, Jerusalem – Two Israelis, including 13-year-old boy, seriously wounded in stabbing attack.

t)      October 12, 2015, Jerusalem – Israeli soldier wounded in stabbing attack and terrorist attempted to seize soldier's gun.

u)      October 13, 2015, Raanana – 5 injured in two separate stabbing attacks.

v)      October 13, 2015, Jerusalem – Two Israelis, 78-year-old Chaim Haviv and 51-year-old Alon Govberg, murdered and fifteen other Israelis wounded, including plaintiff Richard Lakin, in combined stabbing and shooting attack on Bus No. 78. Plaintiff Richard Lakin subsequently died of his wounds from the attack. The terrorist attackers were affiliated with Hamas.

w)    October 13, 2015, Jerusalem – 59-year-old Rabbi Yeshayahu Krishevsky murdered and five other Israelis wounded in vehicular ramming and stabbing attack.

x)    October 14, 2015, Jerusalem – Two Israelis injured in stabbing attack. The terrorist attacker was affiliated with Fatah.

y)    October 14, 2015, Jerusalem – 72-year-old Israeli woman injured in stabbing attack outside Jerusalem's Central Bus Station. The terrorist attacker was affiliated with Fatah.

z)    October 16, 2015, Hebron – Israeli soldier wounded in stabbing attack carried out by terrorist disguised as photojournalist. The terrorist attacker was affiliated with Hamas.

aa)    October 16, 2015, Jerusalem – Terrorist attack foiled after police officers discovered explosive device at checkpoint near Hebrew University.

bb)    October 17, 2015, Jerusalem – Attempted stabbing of police officers in Jerusalem.

cc)    October 17, 2015, Hebron – Two Israeli soldiers wounded in separate stabbing attacks. The terrorist attackers were affiliated with Hamas.

dd)    October 17, 2015, Kalandiya Checkpoint – Attempted stabbing of police officers.

ee)    October 18, 2015, Beer Sheva – 19-year-old Israeli soldier killed and 10 Israelis wounded in combined stabbing and shooting attack at Central Bus Station. The terrorist attacker was affiliated with Hamas.

ff)    October 20, 2015, Hebron – Israeli soldier wounded in a stabbing attack; separately, 54-year-old Avraham Hasno was deliberately run over and killed by Palestinian driving a truck after his vehicle was stoned.

gg)    October 20, 2015, Gush Etzion junction – Two Israelis lightly wounded in a car ramming and attempted stabbing attack.

hh)    October 21, 2015, Yitzhar – Attempted stabbing attack.

ii)    October 21, 2015, Ofra – Israeli policeman injured in car-ramming attack. The terrorist attacker was affiliated with Hamas.

jj)    October 21, 2015, Adam Junction – Female Israeli soldier critically wounded in stabbing attack.

kk)    October 21, 2015, Hebron – Five Israeli soldiers injured in combined stoning and car-ramming attack.

ll)    October 22, 2015, Beit Shemesh – 18-year-old Jewish religious studies student stabbed by terrorists outside synagogue after failed attempt by terrorists to board school bus carrying children on the way to school. The terrorist attackers were affiliated with Hamas and Izz al-Din Al-Qassam Brigades.

mm)    October 23, 2015, Beit El – Israeli couple and their three young children (including a four-year-old), grievously injured in a fire bomb attack on their car.

nn)    October 23, 2015, Gush Etzion – Israeli soldier wounded in stabbing attack.

oo)    October 24, 2015, Gilboa Crossing – Attempted stabbing of Israeli security guard. The terrorist attacker was honored by Hamas and Palestinian Authority President Mahmoud Abbas.

pp)    October 25, 2015, Metzad – 58-year-old Israeli man wounded in stoning and stabbing attack. The terrorist attacker was affiliated with Hamas.

qq)    October 25, 2015, Hebron – Attempted stabbing of Israeli policeman. The terrorist attacker was honored by Hamas.

-10-

rr) October 25, 2015, Ariel Junction – Israeli man wounded in stabbing attack.

ss) October 26, 2015, Hebron – Israeli soldier wounded in stabbing attack; separate attempted stabbing attack on another Israeli soldier. The terrorist attacker was affiliated with Fatah.

tt) October 27, 2015, Gush Etzion Junction – Israeli soldier stabbed by two terrorists. The terrorists were honored by both Fatah and Hamas.

uu) October 27, 2015, Jerusalem – Terrorist attack foiled when two Israeli Arabs arrested in center of town with axe and knife.

vv) October 28, 2015, Hebron – Attempted stabbing of Israeli soldier.

ww) October 28, 2015, Gush Etzion Junction – Israeli woman stabbed in the back outside supermarket.

xx) October 29, 2015, Hebron – Israeli soldier stabbed and wounded; separate attempted stabbing of Israeli soldier. The terrorist attackers were honored by Hamas.

yy) October 29, 2015, near Jerusalem – Shots fired at bus stop by passing vehicle.

zz) October 30, 2015, Tapuach Junction – Two terrorists on motorbike attempted to stab Israeli police officers.

aaa) October 30, 2015, Jerusalem – Israeli injured in stabbing attack near light rail.

bbb) October 31, 2015, Gilboa Crossing – Attempted stabbing attack on Israeli guards. The terrorist attacker was given a formal military funeral by the Palestinian Authority, and was honored by the Palestinian Islamic Jihad.

17. This wave of Palestinian terrorism directed at Jews and Israelis has continued until today, with even more attempts to cause larger numbers of casualties using handguns,

machine guns, and explosives. In the short period since October 1, 2015, Palestinian terrorists have carried out more than 200 stabbings, more than 80 shootings, and more than 40 attacks using vehicles, all targeting Jews and Israelis living in Israel. These attacks have not been merely spontaneous, random acts of violence; they have been part of a planned, coordinated, and deliberate program of ongoing terror mobilized by terrorist organizations and individuals.

### *The Rampant Incitement to Terror and Murder on Facebook*

18.    These attacks and numerous others are part of a new terror campaign driven by terrorist organizations and entities using social media, including Facebook, to facilitate their terrorist and other criminal activities. The terrorists use Facebook to carry out their terrorist activities in many ways. Among other things, Palestinian terrorists use Facebook's social media platform and communication services to incite, enlist, organize, and dispatch would-be killers to "slaughter Jews." This campaign is being directed by terrorist organizations and the Palestinian leadership. Using Facebook openly and in their own names, known terrorists have incited and encouraged these attacks, and have praised the terrorists who have carried them out. This wave of violence has been variously labeled as a new "Al Aqsa Intifada," as the "Knife Intifada," and as the "Facebook Intifada."

19.    On October 19, 2015, Israeli Prime Minister, Benjamin Netanyahu, explicitly identified Facebook as the driving force in the current wave of murderous attacks and described the phenomenon as "the integration between extremist Islam with the Internet; Osama Bin Laden meets Mark Zuckerberg."

20.    The Prime Minister noted that the use of Facebook to incite terrorism and violence is not random; it is being directed and sourced from certain unscrupulous leaders in the

Palestinian Authority, Hamas, and the Islamic Movement in Israel (the Israeli branch of the Islamic Brotherhood terror organization in Egypt and elsewhere).

21.    By way of illustration, on October 1, 2015, a prominent member of the Fatah Central Committee, Mahmoud al-Aloul, posted to his Facebook page a video showing armed fighters from the Al-Aqsa Martyrs' Brigade set to music encouraging listeners to give their lives for the Al-Aqsa Mosque. A few days later, on October 5, 2015, al-Aloul posted on his Facebook page: "We were brought up on the expression 'potential Martyrs' and whoever loves the *Shahada* [seeking martyrdom] is not afraid of the settler herds [euphemism for Jews], who will vanish sooner or later…. Blessings to a mighty gigantic people." He concluded this post with an explicit order to his followers and Facebook friends: "#let'scontinuetheattacks."

22.    The Palestinian perpetrators of these attacks, including terrorists operatives of designated terrorists organizations as well as young Palestinians who have been drawn into the social media web of these terrorist groups, have heeded these calls to action.

23.    They are Facebook users who, through their Facebook pages, groups and networks, receive motivation, advice and directions (referred to collectively herein as "Terrorist Incitement") about how to carry out terrorist attacks against Jews and who further communicate and disseminate this Terrorist Incitement on their own pages. This Terrorist Incitement is purposefully disseminated using Facebook by designated terrorist organizations and their cohorts.

24.    The Terrorist Incitement is in the form of videos, photos, diagrams and text containing detailed instructions on how to achieve the maximum bodily harm and create the most lethal weapons.

25.    Such instructional material has been posted under headings like, for example, "The Intifada Has Started," "The Third Intifada," "The Knife Intifada," "Poison the Knife Before You Stab," and "Slaughtering the Jews."

26.    These instructional materials have appeared on the Facebook pages of groups and businesses, some of which are linked to designated terrorist organizations such as Hamas and the al Aqsa Martyrs Brigades, which purposely use Facebook as a platform to distribute their hateful messages. Below are some graphic examples:

a)    The Hamas-owned news portal alresalah.net posted an image on its Facebook page of a youth holding a knife walking towards two religious Jews at a Jerusalem bus stop with the "Knife Intifada" hashtag.



b)    A cartoon on the Facebook page of the Hamas-affiliated "Palestine Now" shows a Palestinian making a victory sign with his fingers, drawn as two knives.



c)      A terrorist-affiliated Facebook page titled "Mobilize the Third Palestinian Intifada" depicted a bloody knife in the shape of a map of Palestine, superimposed over an image of a rifle and set next to the al-Aqsa mosque, with the caption "The methods are different. The goals are the same" and the hashtag "The Intifada Has Started."



d)      Multiple terrorist-affiliated Facebook pages, including a Facebook page titled "Intifada Youth Coalition – Palestine" posted a video demonstrating how to carry out a deadly stabbing.



27.      These terrorist-affiliated Facebook group pages have hundreds of thousands of followers or more. According to a Times of Israel report, "Facebook pages such as Quds News Network (3.6 million followers on Facebook, 264,000 on Twitter); Shehab News Agency (4.1 million followers on Facebook, 99,000 on Twitter), and Urgent from Gaza (282,000 followers on Facebook) flood Palestinian computer screens with gruesome images of dead Palestinians and caricatures encouraging more attacks, often accompanied by a hashtag ordering "stab!" or warning "al-Aksa is in danger!" The Quds News Network, Shehab News Agency, and Urgent from Gaza are all Hamas-run or Hamas-affiliated sites.

28.     The Palestinian terrorists also use their individual Facebook pages to post graphic images calling for violence against Jews and Israelis, to mobilize their friends, advertise when they are about to carry out an attack and to praise, honor and glorify those who have already carried out attacks.

29.     Images that have appeared on the personal pages of Facebook users under the hashtag "Knife Intifada," include a bloody knife against the backdrop of Jews waving Israeli flags with the caption "We are coming to slaughter you. Allah bless the men of resistance.";



An adaptation of the Facebook logo showing a hand holding a knife piercing a blue Star of David, emphasizing the terrorists' reliance on the support of Facebook;



and a cartoon image of a Palestinian stabbing an IDF soldier armed with a rifle and the al Aqsa Mosque in the background.



30.    Other hashtags employed by Palestinian terrorists on Facebook to accompany posts inciting violence against Jews, include an order to "Stab,"



and "Third Intifada."



31.     Palestinian terrorists have used Facebook to teach practical tips on how to make attacks more deadly, including which part of the body to target, how to approach the victim and escape, suggesting dipping the knife in poison to create a more deadly weapon, or using syringes filled with poison.

32.     One Palestinian terrorist used Facebook to instruct: "To the heroes of knives who intend to strike at the occupying soldiers: Anoint the knives with a poisonous substance – thus you will cause an infection in the victim and they won't be able to stitch the wound. Spread this knowledge."

33.     Palestinian terrorists have used Facebook to issue specific calls to action, including mobilizing violent riots and attacks, such as the following: "Every young person who doesn't go has no honor;" "At 8 p.m. at the entrance to Qalansuwa, come masked. This has deliberately been organized at a late hour so that they won't be able to identify us. We will ask them to turn off the city lights so we won't be identifiable, we will set the area on fire;" and "We demand that our young people arrive at the Shuafat camp so thousands attack the crossing." One such post is depicted below.



34.    One Palestinian terrorist used Facebook to direct readers to attack Jewish travelers: "Check vehicles very carefully. Attack any Jew who passes. We don't want to see them."

35.    The Palestinian terrorists' use of Facebook to disseminate Terrorist Incitement as described above, calling for the murder of Jews and explaining how to accomplish this, has directly led to specific terrorist attacks listed herein.

36.    For example:

a)    A terrorist's Facebook page titled "Jerusalem Now" posted a "how to" video on how to stab a soldier and snatch his weapon.



At least three terror attacks in October 2015 were carried out by terrorists who in fact, stabbed soldiers and seized or attempted to seize their weapons.

b)    One terrorist, Subhe Abu Khalifa, stabbed and wounded two Israelis after seeing a terrorist video glorifying a different stabbing attack.

c)    Another terrorist, Tarek Yehiye, who stabbed an IDF soldier in Afula on Oct. 8, 2015, told Israeli police that after seeing a terrorist social media clip calling for attacks on Jews, he bought a knife and went to Afula to stab a Jew.

d)    Other terrorists interrogated over the course of this wave of attacks have similarly confessed that they carried out their attacks in response to various terrorist Facebook posts that were delivered to their computer screens.

37.    As a direct result of these daily Terror Attacks, which are facilitated and mobilized by terrorists using Facebook, each of the plaintiffs herein is forced to live in real fear

of imminent Terror Attacks which could take place anywhere and at any time of day or night. Plaintiffs have been injured physically, emotionally, and in their property and personal security. Jews and Israelis living in Israel, including the 20,000 Israeli plaintiffs in this lawsuit, are truly being terrorized; they live in daily fear of an imminent attack that may occur while they stand at a bus stop, pray in a synagogue, shop in the supermarket, ride in a car, or even stay in their homes.

38.    According to the Mayor of Jerusalem (where many of the terrorist attacks have been perpetrated), Nir Barkat, "When they interrogate the terrorists, what we see is young people who are incited to a level I have never seen before, and you see that they seek to harm innocents and listen to no one except Facebook and Twitter."

39.    Former Israeli Ambassador to the United States Dore Gold explained that whereas ten years ago, terrorist organization Hamas would publish a booklet in print with limited impact, today, the same publication can be posted to Facebook and widely disseminated to rapid and devastating effect.

40.    None of this is news to Facebook. Palestinian terrorists have been openly using Facebook in their own names for years. The use of social media by terrorists—and specifically Facebook—has been the focus of news articles, studies, and even Congressional hearings for several years. Facebook receives complaints every day about Palestinian terrorists using Facebook, but it only rarely closes them down. In fact, Facebook has at times deleted a specific post on a known terrorist entity's Facebook site, leaving the site itself online. The names and symbols of many Palestinian terrorists groups and individuals are well known, and many are easily identified by name on lists of "Specially Designated Global Terrorists" or "Foreign Terrorist Organizations" to whom providing services is a federal crime. These include Hamas,

the the Izz Al-Din Al-Qassam Brigades, the Al-Aqsa Martyrs Brigades, Interpal, Al-Aqsa TV, Musa Abu Marzouk, and many others. Facebook has the data and the capability to cease providing services to terrorists, but it has chosen not to do so.

### *The Role of Facebook in Facilitating Terrorist Activity and Incitement*

41.    Facebook provides a sophisticated internet social media platform and other products and services under the general trade name "Facebook." Facebook provides "Services" to its registered users, who register by inputting their identifying information and "clicking" on a specified "button" (for example, a "Sign Up" button to register an account, or a "Get Started" button for creating a "Page"). Above the "Sign Up" button is a statement in small type: "By clicking Sign Up, you agree to our Terms and that you have read our Data Policy, including our Cookie Use." Above the "Get Started" button is a statement in small type: "By clicking Get Started, you agree to the Facebook Pages Terms." It is not necessary to view any of the "Terms" or other policies or conditions in order to proceed with registration.

42.    Facebook's services provide registered users with the ability to create personal on-line pages with information about themselves, including geographic information, interests and photos. Registered users are able to use Facebook to create networks of Facebook "friends" (who are also registered users) with whom they can share personal Facebook "posts". These Facebook posts can take many forms, such as a photo with a caption, sharing a web link or a news article from another website, endorsing or "liking" a product, promoting a Facebook business or group page, and more. Facebook also enables registered users to "like" and share posts of their Facebook friends, thereby exposing these posts to new networks.

43.    Facebook also enables its registered users to create special Facebook "group" pages to promote themselves, their interests, business endeavors, and more. When creating one

of these "group" pages, registered users are asked to choose a category for the page, such as: local business, organization, product, public figure, entertainment or cause. Using Facebook, registered users can share these pages with Facebook friends, who can then share the pages with their Facebook friends, exposing the content to a wide network of people well beyond the original registered user's own personal contacts.

44.    According to Facebook's "Data Usage Policy," Facebook collects extensive and detailed information about its users based upon nearly everything the user does on the internet via their computer, smart-phone, or other device on which they use Facebook. This includes, for example, their location, time and frequency of internet use, the content they post, the content they view or engage with, people they communicate with, groups they belong to and how they interact with such groups, visits to third party websites, use of applications, advertisements they view, products they purchase, services they use, information collected by Facebook partners, and more.

45.    Facebook uses this information in a variety of ways, including among other things "creating engaging and customized experiences for people." *See* Facebook Data Usage Policy, available at https://www.facebook.com/about/privacy/.

46.    Facebook's computers implement algorithms which utilize the data it collects to suggest friends, groups, products, services and local events, and target notices and advertisements that will be "as relevant and interesting" as possible to each individual user. This enables Facebook to customize its Services to the specific likes and interests of each of its registered users.

47.    Among other things, Facebook effectively serves as a broker or match-maker between like-minded people, introducing them to one another and to groups, events, and

information that they will be interested in based on the information in their Facebook user profiles and data collected from their online activities.

48.     Facebook's algorithms suggest new Facebook friends to users based on such factors as friends of friends, group membership, geographic location, event attendance, language, and more. Thus, for example, Facebook purposefully provides users who have expressed an interest in the "Knife Intifada" or stabbing Jews (by joining groups, attending events, visiting pages, or submitting posts with those themes) with Facebook friend suggestions of other users that Facebook has identified with similar interests. Facebook thereby assists in introducing and connecting users with similar interests. Palestinian terrorists have used this feature of Facebook to connect with other terrorists as well as to draw followers and new recruits to their Facebook pages and ultimately to their terrorist activities.

49.     Palestinian terrorists similarly take advantage of the fact that Facebook will purposefully suggest, for example, groups, events, pages, and posts promoting and inciting "intifada", "Jew killing", "stabbing", etc., to users who have viewed, "liked", or shared pages on those subjects, or who have joined similar groups, or attended similar events.

50.     Facebook also uses the data it collects about its users and its algorithms to purposefully recommend and encourage users to attend events in their geographical area that it determines may be of interest to the user, or that the user's Facebook friends or contacts may be advertising or attending. For example, Palestinian terrorists use Facebook to post notices of upcoming planned riots or rallies, which are then recommended to other Facebook users in the geographical area who have similar characteristics or interests as the terrorists.

51.     These types of recommendations or suggestions may appear in a Facebook user's newsfeed or on the side margins of the user's page. Each time a registered user logs in, Facebook also provides "notifications" about friend, group and event suggestions.

52.     Although only registered Facebook users may post messages, create pages, and use the full interactive services of Facebook, many Facebook pages may be accessed and viewed by non-Facebook users (i.e., persons who or not registered Facebook users). Non-Facebook users who view Facebook pages may also receive recommendations of similar Facebook pages.

53.     Facebook's algorithms move posts that are likely to be of interest and garner likes, shares, and comments, to the top of a user's newsfeed so that, for example, a person who has been vocal in supporting Intifada and incitement will be flooded with similar posts on those topics upon logging into Facebook.

54.     When a user clicks on a video clip through Facebook, a box appears on the page recommending other similar videos. Thereby, for example, Facebook purposefully directs users who have viewed "how to" videos on stabbing Jews to other similar videos promoting violence against Jews.

55.     Facebook's targeted advertising algorithms enable all kinds of advertisers, whether for commercial products, business services or causes to reach the most interested audiences. Advertisers are able to target their ads by key words and interests, including such words as "Hamas," which could reach hundreds of thousands of people interested in terrorism against Israelis. In addition, through "remarketing" and conversion pixels, Facebook allows outside advertisers to target Facebook ads to users who have visited the advertisers' webpages in the past. Thus, for example, if a user has visited the webpage of an entity that supports Intifada

or violence against Jews, that person will then receive ads in their Facebook feed from those websites.

56.    Using Facebook and its sophisticated algorithm and features, terrorists are enabled to more effectively disseminate criminal Terrorist Incitement, including commands to murder Israelis and Jews, to those most susceptible to that message, and who most desire to act on that incitement.

57.    By facilitating, encouraging, and brokering the connections between and among these terrorist organizations and hundreds of thousands of individuals and organizations who have indicated through their Facebook pages that they sympathize with the terrorist-cause, Facebook thus facilitates terrorist activity, including murder, injury and other damage to countless innocent victims and their property and businesses.

58.    The sophisticated features of Facebook are also used by Palestinian terrorists for communications, intelligence, and logistical purposes, to recruit, train, and instruct followers, to plan, incite, and mobilize attacks, to raise funds, and much more.

59.    By providing services to Palestinian terrorists, Facebook facilitates and supports this new wave of Palestinian terrorists and would-be terrorists. Among other things, these terrorists use Facebook to disseminate Terrorist Incitement in the form of orders and instructions to commit murder against Jews and Israelis.

60.    Nevertheless, Facebook continues to provide services to terrorists promoting Terrorist Incitement, despite the fact that this incitement has actually led to Terror Attacks and caused death and injury to Israelis.

*Facebook Has the Ability to Monitor and Stop This Incitement*

61.    The same algorithms that allow Facebook to make matches between people of similar interests allow Facebook to flag, review, and deny services to users who threaten or call for terrorism, or offers training and instruction to terrorists.

62.    Indeed, upon information and belief, Facebook regularly removes hate-speech and "fighting words" material from other sites and regularly monitors its website for pornographic materials which are removed immediately.

63.    While the *Communications Decency Act of 1996* ("CDA"), 47 U.S.C § 230, generally protects providers of interactive computer services from claims based upon treating the provider as the speaker or publisher of content provided by another information content provider, it does not exempt Facebook from federal or state criminal law, laws that are consistent with the Act, or claims that Facebook is tortuously, wrongly, and illegally providing its services to terrorists. Morever, the CDA does not apply outside the territorial jurisdiction of the United States.

64.    Palestinian terrorist groups and individuals have a long history of planning and carrying out attacks against Jews in Israel. Their stated goals to attack, murder, and intimidate Jews in Israel, and ultimately to eliminate Jews and Israel from the land, are well known. They direct every resource toward these goals and they act on these goals. Their activities constitute a very real and dangerous threat to Israelis, including Plaintiffs. Facebook has knowingly and recklessly ignored the threat that Palestinian terrorists pose to Plaintiffs.

65.    Facebook should have denied its services to Palestinian terrorists because they are terrorists, not simply because of the content they publish.

66.    Based upon the identity and history of Palestinian terrorists, it was reasonably foreseeable that their use of Facebook would be directed toward harming Israelis. Facebook

-28-

owed a duty to Plaintiffs not to provide services to these terrorists. Over time, the terrorists became even more emboldened by Facebook's refusal to shut down their public and open use of Facebook. As the terrorists became more emboldened they began to use Facebook even more aggressively as a tool for directly mobilizing attacks against Israelis. Ultimately, the terrorists began the current intensive program of terrorist incitement using Facebook to cause Palestinian youth to carry out terror attacks as well. If only Facebook had from the beginning fulfilled its duty to deny its services to Palestinian terrorists, the "Facebook Intifada" would not have happened.

## AS AND FOR A FIRST CAUSE OF ACTION
## NEGLIGENCE
### (Under the Law of the State of Israel)

67.    Plaintiffs repeat and re-allege each of the foregoing allegations with the same force and effect as if more fully set forth herein.

68.    Pursuant to CPLR § 4511(b) Plaintiffs hereby give notice of their intention to request that the Court takes judicial notice of the law of the State of Israel.

69.    Causes of action in tort in Israeli law are codified in the Civil Wrongs Ordinance (New Version) - 1972 (hereinafter "CWO").

70.    The CWO provides that any person injured or harmed by the civil wrongs (i.e. torts) enumerated in the CWO is entitled to relief from the person liable or responsible for the wrong.

71.    CWO § 35 creates a tort of Negligence.

72.    Under binding precedent of the Israeli Supreme Court, the tort of Negligence also includes intentional and/or reckless conduct.

73.     CWO § 35 provides that a person is liable for the tort of Negligence when he commits an act which a reasonable and prudent person would not have committed under the same circumstances; or refrains from committing an act which a reasonable and prudent person would have committed under the same circumstances; or, in the performance of his occupation, does not use the skill or exercise the degree of caution which a reasonable person qualified to act in that occupation would have used or exercised under the same circumstances, and thereby causes damage to another person toward whom, under those circumstances he is obligated not to act as he did.

74.     CWO § 36 provides that the obligation stated in the last sentence of § 35 is toward all persons, to the extent that a reasonable person would have under the same circumstances foreseen that, in the ordinary course of events, they were liable to be injured by the act or omission.

75.     By providing resources and services to Palestinian terrorists that, among other things, facilitate, encourage, and broker the connections between and among Palestinian terrorist organizations and hundreds of thousands of individuals and groups who have indicated through their Facebook pages that they sympathize with the terrorist-cause, defendant Facebook has performed acts which a reasonably prudent person would not have committed under the same circumstances, within the meaning of the CWO.

76.     Defendant did not, in the performance of its occupation, use the skill or exercise the degree of caution which a reasonable person qualified to act in that occupation would have used or exercised under the same circumstances, within the meaning of the CWO, in that, *inter alia*, Facebook provides resources and services to terrorists that, among other things, enable terrorists to spread their murderous plans and incite and instruct others to carry out such plans.

77.     Defendant acted negligently in connection with Plaintiffs, toward whom, in the circumstances described herein, Defendant had an obligation not to act as it did. Defendant was obligated not to act as it did because a reasonable person would, under the same circumstances, have foreseen that, in the ordinary course of events, persons such as Plaintiffs were liable to be harmed by the acts of Defendant described herein.

78.     The behavior of Defendant constitutes Negligence under the CWO, and that negligent behavior is the proximate cause of Plaintiffs' harm described herein.

79.     Facebook's conduct is ongoing, and continues to cause damage to Plaintiffs.

80.     The nature of the damage that Facebook's conduct causes to Plaintiffs is such that no amount of money damages can make Plaintiffs whole, and Plaintiffs therefore have no adequate remedy at law.

81.     By reason of the foregoing, Plaintiffs are entitled to an injunction barring Facebook from engaging in conduct as alleged herein.

## AS AND FOR A SECOND CAUSE OF ACTION
## BREACH OF STATUTORY DUTY
### (Under the Law of the State of Israel)

82.     Plaintiffs repeat and re-allege each of the foregoing allegations with the same force and effect as if more fully set forth herein.

83.     Pursuant to CPLR § 4511(b) Plaintiffs hereby give notice of their intention to request that the Court take judicial notice of the law of the State of Israel.

84.     CWO § 63 creates a civil wrong of Breach of Statutory Duty defined as the failure to comply with an obligation imposed under any "enactment," if the enactment is intended for the benefit or protection of another person, and if the breach of the enactment caused that person damage of the kind or nature intended to be prevent by the enactment.

85.    Under Israel's Interpretation Ordinance (New Version), and "enactment" within the meaning of the CWO is defined to mean "every law and every regulation," while the terms "law" and "regulation" are defined in turn as acts of the Knesset (Israel's parliament) and of "any authority in Eretz Israel [Hebrew: Land of Israel] or in Israel," respectively.

86.    CWO § 63(b) provides that for the purpose of CWO § 63, an enactment is deemed to have been enacted for the benefit or protection of a specific person, if it is intended for the benefit or protection of that person, or for the benefit or protection of persons in general, or of persons of a category or definition to which that specific person belongs.

87.    Defendant Facebook breached and failed to comply with obligations imposed upon it by numerous enactments, which were intended for the benefit and protection of persons in general, and for the benefit and protection of persons of the type, category and definition to which Plaintiffs and the Decedent belong, within the meaning of the CWO.

88.    The statutory obligations breached by defendant Facebook include, without limitation, the provisions of the following enactments:

a)    Sections 1 and 4 of Israel's Prevention of Terrorism Ordinance, 5708-1948 (which criminally prohibit praise, support, calls for support of terrorism);

b)    Sections 134, 136, 144, 145, and 148 of Israel's Penal Law 5737 – 1977 (which criminally prohibit all forms of incitement to violence and terror as well as material support for terrorism).

c)    Sections 84-85 of Israel's Defense Regulations (Emergency Period), 1945 (which prohibit, among other things, the provision of any service for any unlawful organization, including groups engaged in terrorist activity).

89.     The conduct of Defendant Facebook described herein breached the enactments listed above, despite the fact that Defendant Facebook's conduct did not take place in Israel, because Israel has extraterritorial criminal jurisdiction over crimes against the security of the State of Israel and over crimes against the lives and persons of Israeli citizens as such, pursuant to § 13 of Israel's *Penal Law,* 5737 -1977.

90.     All of the enactments listed above are intended for the benefit and protection of persons in general, for the specific benefit and protection of innocent civilians such as the plaintiffs, in that all of the statutory enactments listed above are intended to protect all such persons from terrorist attacks and from all the damages which terrorist attacks are liable to inflict.

91.     Similarly, the terrorist individuals and organizations who use Facebook to disseminate their Terrorist Incitement targeting Plaintiffs are in breach of statutory duty for violating Sections 1 and 4 of Israel's Prevention of Terrorism Ordinance, 5708-1948 and Sections 134, 136, 144 and 145 of Israel's Penal Law 5737 – 1977. Defendant Facebook aids and ratifies these breaches of statutory duty in violation of CWO § 12, by providing services that enable the Terrorist Incitement to be distributed to hundreds of thousands of individuals and groups who have indicated through their Facebook pages that they sympathize with the terrorist-cause.

92.     Defendant Facebook's breach of its statutory obligation and aiding and ratifying the breaches of statutory obligation by the terrorists who use Facebook is the proximate cause of the harm to Plaintiffs, which is among the kind and nature of damages intended to be prevented by the statutory enactments which were breached by Facebook.

93.     Pursuant to CWO § 15, Defendant is also liable for the breaches of statutory duty of the terrorists who disseminate Terrorist Incitement using Facebook because Defendant negligently enters into contracts with these terrorists knowing that they are intent on using Defendant's services to spread their hateful and murderous Terrorist Incitement targeting Plaintiffs, and Defendant ratified this Terrorist Incitement by allowing these terrorists to use Defendant's services to attract followers for their unlawful purpose of killing Jews.

94.     Facebook's conduct is ongoing, and continues to cause damage to Plaintiffs.

95.     The nature of the damage that the Facebook's conduct causes to Plaintiffs is such that no amount of money damages can make Plaintiffs whole, and Plaintiffs therefore have no adequate remedy at law.

96.     By reason of the foregoing, Plaintiffs are entitled to an injunction barring Facebook from engaging in conduct as alleged herein.

## AS AND FOR A THIRD CAUSE OF ACTION
## VICARIOUS LIABILITY
## (Under the Law of the State of Israel)

97.     Plaintiffs repeat and re-allege each of the foregoing allegations with the same force and effect as if more fully set forth herein.

98.     Defendant knowingly and intentionally provides services to terrorists that, among other things, broker the connections between and among Palestinian terrorist organizations and hundreds of thousands of individuals and groups who have indicated through their Facebook pages that they sympathize with the terrorist-cause and wish to carry out Terrorist Attacks.

99.     "Vicarious Liability" principles are recognized in §§ 12 and 15 of the CWO.

100.    Section 12 of the CWO which provides that a person who participates in, assists, advises or solicits an act or omission, committed or about to be committed by another person, or who orders, authorizes, or ratifies such an act or omission, is liable for such act or omission.

101.    By providing services to terrorists, Defendant knowingly and intentionally assists terrorists to carry out terrorist attacks and spread incitement to murder Jews, knowing that Terror Attacks and the harm to Plaintiffs described herein will be the result of such conduct.

102.    Section 15 of the CWO provides that a person may be liable for the acts or omissions of a party with whom he contracts if he, inter alia, was negligent in selecting the contractor, authorized or ratified the acts of the contractor, or if the contract was entered into for an unlawful purpose.

103.    Defendant negligently enters into service contracts with terrorists who desire to murder Jews and who use such services to, among other things, spread their hateful, murderous and criminal incitement targeting Plaintiffs herein, knowing that Terror Attacks and the harm to Plaintiffs described herein will be the result of such conduct. By allowing terrorists to use its services for such unlawful purposes, Defendant ratifies the conduct of these terrorists.

104.    Facebook's conduct is ongoing, and continues to cause damage to Plaintiffs.

105.    The nature of the damage that the Facebook's conduct causes to Plaintiffs is such that no amount of money damages can make Plaintiffs whole, and Plaintiffs therefore have no adequate remedy at law.

106.    By reason of the foregoing, Plaintiffs are entitled to an injunction barring Facebook from engaging in conduct as alleged herein

## AS AND FOR A FOURTH CAUSE OF ACTION
## PRIMA FACIE TORT

107.   Plaintiffs repeat and re-allege each of the foregoing allegations with the same force and effect as if more fully set forth herein.

108.   Facebook provides services to terrorists that, among other things, actively facilitate, encourage, and broker the connections between and among Palestinian terrorist organizations and hundreds of thousands of individuals and groups who have indicated through their Facebook pages that they sympathize with the terrorist-cause, knowing and intending that such services will facilitate and enable these terror-seeking users to connect with each other and provide each other with instructions and advice on how to commit Terror Attacks that endanger Plaintiffs herein.

109.   As a result of Facebook's services described herein, Plaintiffs suffer psychological and emotional harm by being exposed to a constant imminent threat to their personal safety. At least one Plaintiff herein has suffered actual physical injury and death as a result of a Terror Attack carried out with the assistance of Facebook's services.

110.   There is no excuse or justification for Facebook's provision of services to terrorists and individuals and groups that promote and seek to implement a murderous, terrorist agenda via their networks on Facebook.

111.   Facebook's conduct is ongoing, and continues to cause damage to Plaintiffs.

112.   The nature of the damage that Facebook's conduct causes to Plaintiffs is such that no amount of money damages can make Plaintiffs whole, and Plaintiffs therefore have no adequate remedy at law.

113.   By reason of the foregoing, Plaintiffs are entitled to an injunction barring Facebook from engaging in conduct as alleged herein.

## AS AND FOR A FIFTH CAUSE OF ACTION
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

114.    Plaintiffs repeat and re-allege each of the foregoing allegations with the same force and effect as if more fully set forth herein.

115.    Defendant's conduct is willful, outrageous and dangerous to human life, and violates applicable criminal law, all international standards of civilized human conduct and common decency.

116.    Defendant intended to, and did in fact, harm Plaintiffs, and cause them egregious emotional distress. As a result and by reason providing services to Palestinian terrorist that, among other things, use those services to disseminate threats of terrorism and Terrorist Incitement, plaintiffs are being subjected daily to an imminent threat of Terrorist Attacks and suffer terror and severe mental and emotional anguish, including real fear for their personal safety and security.

117.    Facebook's conduct is ongoing, and continues to cause damage to Plaintiffs.

118.    The nature of the damage that Facebook's conduct causes to Plaintiffs is such that no amount of money damages can make Plaintiffs whole, and Plaintiffs therefore have no adequate remedy at law.

119.    By reason of the foregoing, Plaintiffs are entitled to an injunction barring Facebook from engaging in conduct as alleged herein.

## AS AND FOR A SIXTH CAUSE OF ACTION
## DECLARATORY JUDGMENT
### (Aiding and Abetting a Tort)

120.    Plaintiffs repeat and re-allege each of the foregoing allegations with the same force and effect as if more fully set forth herein.

121.    The services provided by Facebook to Palestinian terrorists has directly led to Terror Attacks in which Israelis have been killed and injured.

122.    Such Terror Attacks constitute an assault and battery on the person of Plaintiffs. They constitute assault because they cause Plaintiffs fear and apprehension of harm and death. In addition, to the extent any of plaintiffs have personally been targeted in a Terror Attack, such intentional, harmful physical attacks on Plaintiffs also constitute a battery on Plaintiffs. Indeed Plaintiff Richard Lakin suffered actual physical harm and death as a result of a Terror Attack.

123.    Facebook substantially assists the Palestinian terrorists, by providing services that, among other things, facilitate, encourage, and broker the connections between and among Palestinian terrorist organizations and hundreds of thousands of individuals and groups who have indicated through their Facebook pages that they sympathize with the terrorist-cause, knowing and intending that such services will facilitate and enable these terror-seeking users to connect with each other and provide each other with instructions and advice on how to commit Terror Attacks that endanger Plaintiffs herein. Facebook's conduct is ongoing, and continues to cause damage to Plaintiffs.

124.    The nature of the damage that Facebook's conduct causes to Plaintiffs is such that no amount of money damages can make Plaintiffs whole, and Plaintiffs therefore have no adequate remedy at law.

125.    By reason of the foregoing, Plaintiffs are entitled to an injunction barring Facebook from engaging in conduct as alleged herein.

## AS AND FOR A SEVENTH CAUSE OF ACTION
## DECLARATORY JUDGMENT
### (Civil Conspiracy)

126.    Plaintiffs repeat and re-allege each of the foregoing allegations with the same force and effect as if more fully set forth herein.

127.    Defendant Facebook's services are provided to its registered users, including the terrorists responsible for the Terror Attacks and Terrorist Incitement discussed herein, pursuant to agreements, express and implied, including Facebook's terms and conditions.

128.    At all relevant times, defendant Facebook knew that Palestinian terrorists were registered users of Facebook, that they had engaged in or were engaging in terrorism, that they were posting incitement to commit Terror Attacks, and that they were using Defendant's Services in order to plan, direct, and commit terrorism and to direct their Terrorist Incitement to the widest possible audience of individuals most likely to act upon it.

129.    At all relevant times, defendant Facebook knew that providing services to these terrorist individuals and groups likely would result in Terrorist Attacks targeting Plaintiffs, causing the harm to Plaintiffs set forth herein.

130.    Accordingly, by providing services to individual terrorist and terrorist organizations the purpose of which is, among other things, to direct the Terrorist Incitement of these terrorists to those who most desire to act upon it through Defendant's website, defendant Facebook knowingly and intentionally conspired, agreed and acted in concert with the individual terrorists and terrorist organizations that use its services to, among other things, promote their murderous incitement targeting Plaintiffs in a common plan and design to facilitate and cause harm to Plaintiffs through Terrorist Attacks, including severe psychological and emotional distress, physical injury and death.

131.    Plaintiffs harm is proximately caused by the terrorist's use of Facebook, including Terrorist Incitement, which directly results in Terrorist Attacks.

132.    Facebook's conduct is ongoing, and continues to cause damage to Plaintiffs.

133.    The nature of the damage that Facebook's conduct causes to Plaintiffs is such that no amount of money damages can make Plaintiffs whole, and Plaintiffs therefore have no adequate remedy at law.

134.    By reason of the foregoing, Plaintiffs are entitled to an injunction barring Facebook from engaging in conduct as alleged herein.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
## DECLARATORY JUDGMENT
### (47 U.S.C. § 230)

135.    Plaintiffs repeat and re-allege each of the foregoing allegations with the same force and effect as if more fully set forth herein.

136.    Title 47 U.S.C. § 230(c)(1) provides that "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."

137.    Facebook is not merely a "publisher or speaker" with regard to the Terrorist Incitement described herein, which consists of graphic videos and images explaining how to carry out a Terror Attack, create weapons and choose victims and specific orders and directives to go out and stab and slaughter Jews. Facebook's role goes far beyond serving as a mere bulletin board or platform for speech. Rather, Facebook actively makes introductions between those who incite to murder and mayhem, and those who are interested in committing murder and mayhem. By facilitating connections between and among terrorist organizations and people who incite, encourage, and train people to commit terrorism, and individuals and groups who have expressed

through their Facebook pages that they support or are inclined to commit terrorism, defendant Facebook actively assists terrorists to find people who are interested in their hateful messages of terrorism and violence. Just as "fighting words" are not protected speech, threats of terrorism, Terrorist Incitement, and providing resources and services to terrorists is not protected. Facebook's conduct is indefensible.

138.    Moreover, the type of instructional material and specific calls to murderous action that comprise the Terrorist Incitement is not "information" within the meaning of 47 U.S.C. § 230(c)(1).

139.    Construing this statute in a way that would grant Facebook blanket immunity from claims of plaintiffs who suffer real and imminent danger as a result of incitement to Terror Attacks made more effective through Facebook's services would be an overly broad application of this statute.

140.    In enacting § 230, Congress stated its finding that "interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity. § 230(a)(3).

141.    At the same time, Congress stated its policy "to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer." § 230(b)(5).

142.    Providing a platform and services to terrorists, terrorist threats, calls to murder people based on their religion, and incitement to commit terrorist acts are all outside the realm of "political discourse…cultural development, and …intellectual activity," § 230(a)(3), and are plainly within the realm of "obscenity, stalking, and harassment," § 230(b)(5).

143.    Any interpretation of § 230 must be built on the foundation of the findings and policies expressed by Congress in enacting it, which were plainly to encourage the traditional "free marketplace of ideas" that is the cornerstone of American democracy, not murder and terrorism, which is the exact opposite of that vaunted American ideal.

144.    The law of all 50 states and federal law has long recognized a distinction between protected speech and "fighting words" or incitement to riot, murder, and mayhem that can be regulated and even criminalized. Congress did not preempt or override this distinction in enacting § 230.

145.    State laws prohibiting the dissemination of hate speech, calls to murder, obscenity, stalking or harassment are not superseded by § 230.

146.    Neither are laws that prohibit or punish Terrorist Incitement, incitement to riot, calls to violence, or orders to kill or injure, superseded by § 230.

147.    The laws of foreign states, such as the State of Israel are not preempted or superseded by § 230.

148.    By reason of the foregoing, Plaintiffs are entitled to a declaratory judgment finding that 47 U.S.C. § 230 does not grant immunity to Facebook for the claims alleged herein.

## **REQUEST FOR INJUNCTIVE RELIEF**

149.    Plaintiffs repeat and re-allege the foregoing allegations with the same force and effect as if more fully set forth herein.

150.    Facebook's failure to deny services to Palestinian terrorists, immediately shut down their sites and remove their threats of terrorism and Terrorist Incitement, which includes orders, directives, instructional videos and images with one singular message – to attack and kill Jews – directly contributes to the spread of violence and leads to new Terror Attacks every day.

151.    Moreover, Facebook has the ability to actively monitor its registered users to ensure that it is not providing services to terrorists in the same way it monitors for hate speech and pornography.

152.    By failing to immediately shut down terrorists' use of Facebook and monitor its registered users for terrorist threats and Terrorist Incitement, Facebook is in violation of Israeli law as alleged herein.

153.    Facebook's failure to act has already caused and will continue to cause Plaintiffs irreparable injury by forcing them to live in constant fear for their personal safety and security and subjecting them to an imminent threat of harm.

154.    Plaintiffs do not have a plain, speedy and adequate remedy in the ordinary course of law.

155.    Accordingly, an injunction should issue enjoining Facebook to (a) immediately cease providing any services to Palestinian terrorists and shut down all sites operated by or associated with terrorists or their supporters; (b) actively monitor its registered users and its platform for activity or information that would indicate that it is providing services to terrorists, including the names and symbols of terrorist groups and individuals, threats of terrorism, Terrorist Incitement, calls for attacks against and murder of Jews and Israelis, and more; and (c) cease serving as match-maker between terrorists, terrorist organizations, and those who would carry out terrorist attacks.

**WHEREFORE**, Plaintiffs demands judgment against Defendant for the relief requested herein, plus attorney's fees to the extent permitted by law.


Dated:    Brooklyn, New York
          October 10, 2016

Yours,

THE BERKMAN LAW OFFICE, LLC
*Attorneys for the plaintiffs*

by:    Robert J. Tolchin

111 Livingston Street, Suite 1928
Brooklyn, New York 11201
(718) 855-3627

NITSANA DARSHAN-LEITNER & CO.
Nitsana Darshan-Leitner
*Israeli counsel for the plaintiffs*
10 Hata'as Street
Ramat Gan, 52512 Israel
Israeli #: 011-972-3-7514175
U.S. #: 212-591-0073