# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| **RACHELI COHEN, et al.,** | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Case No. 16-04453 (NGG) (LB) |
| | ) | |
| v. | ) | ECF Case |
| | ) | |
| **FACEBOOK, INC.,** | ) | Oral Argument Requested |
| | ) | |
| Defendant. | ) | |
| | ) | |
| **STUART FORCE, et al.,** | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Case No. 16-05158 (NGG) (LB) |
| | ) | |
| v. | ) | ECF Case |
| | ) | |
| **FACEBOOK, INC.,** | ) | Oral Argument Requested |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DEFENDANT'S COMBINED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTIONS TO DISMISS

Shireen A. Barday
Aulden Burcher-DuPont
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-6460
shireen.barday@kirkland.com

Craig S. Primis, P.C.
K. Winn Allen
Jennifer M. Bandy
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C.  20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200
craig.primis@kirkland.com

*Attorneys for Defendant*

November 8, 2016

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................................1

BACKGROUND ...................................................................................................................4

      A.      *Cohen* Amended Complaint.........................................................................5

      B.      *Force* Amended Complaint..........................................................................6

LEGAL STANDARDS ON A MOTION TO DISMISS...................................................7

ARGUMENT .........................................................................................................................8

I.      The Communications Decency Act Requires Dismissal Of Plaintiffs' Claims..................8

      A.      Section 230 of the CDA Immunizes Providers of Interactive Computer Services from Civil Liability for Content Created by Third-Party Users. ...............8

      B.      Section 230 of the CDA Requires Dismissal of Plaintiffs' Claims. .....................10

            1.      Facebook Is a Provider of an Interactive Computer Service. ...................10

            2.      Plaintiffs Attempt to Hold Facebook Liable as the Publisher or Speaker of the Alleged Terrorist Content. ...............................................................11

            3.      The Allegedly Harmful Content Was Provided by a Third-Party Facebook User, and Not by Facebook Itself. ...........................................................17

      C.      The *Cohen* Plaintiffs' Attempts to Evade the CDA Are Unavailing. ...................18

II.      This Court Cannot Exercise Personal Jurisdiction Over Facebook. ...................................22

      A.      New York's Long-Arm Statute Does Not Permit Exercise of Specific Jurisdiction Over Facebook in This Case. ............................................................23

      B.      Subjecting Facebook to Jurisdiction Here Would Violate Due Process...............25

            1.      Due Process Does Not Permit the Exercise of Specific Jurisdiction over Facebook in this Action. .......................................................................26

            2.      Due Process Would Not Permit the Exercise of General Jurisdiction over Facebook in New York. ...................................................................27

      C.      Facebook Did Not Consent to Personal Jurisdiction in New York. ......................28

III.      The *Cohen* Plaintiffs Lack Article III Standing to Bring Their Suit.................................30

IV.     The *Force* Plaintiffs Have Failed To State A Claim Under Section 2333 .......................... 32

A.      Plaintiffs Have Not Plausibly Alleged That Their Injuries Occurred "By Reason Of" Facebook's Activities. ........................................................................ 32

B.      Plaintiffs Have Not Plausibly Alleged Secondary Liability Under the ATA. ........................................................................................................................ 34

1.      Facebook Did Not Aid and Abet the Perpetrators of the Attacks. ............. 34

a.      Facebook Did Not Provide Substantial Assistance. ...................... 35

b.      Facebook Did Not Possess the Requisite Knowledge. ................. 37

2.      Facebook Did Not Conspire with the Perpetrators of the Attacks. ............ 37

C.      Plaintiffs Also Have Not Plausibly Alleged Direct Liability for an "Act of International Terrorism." .................................................................................. 38

CONCLUSION .......................................................................................................... 40

# TABLE OF AUTHORITIES

Page

**Cases**

*7 West 57th Street Realty Co., LLC v. Citigroup, Inc.,*
No. 13 Civ. 981, 2015 WL 1514539 (S.D.N.Y. Mar. 31, 2015) ............................................ 27

*Allen v. Wright,*
468 U.S. 737 (1984) ................................................................................................................. 31

*Anza v. Ideal Steel Supply Corp.,*
547 U.S. 461 (2006) ................................................................................................................. 32

*Arbaugh v. Y&H Corp.,*
546 U.S. 500 (2006) ................................................................................................................. 21

*Arroyo v. Mountain Sch.,*
892 N.Y.S.2d 74 (1st Dep't 2009) ........................................................................................... 23

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) .............................................................................................................. 7, 39

*Atlantic Marine Constr. Co. v. U.S. Dist. Ct. for the W. Dist. of Tex.,*
134 S. Ct. 568 (2013) ............................................................................................................... 23

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007) ................................................................................................................. 34

*Best Van Lines, Inc. v. Walker,*
490 F.3d 239 (2d Cir. 2007) .................................................................................................... 23

*Bonkowski v. HP Hood LLC,*
No. 15-CV-4946, 2016 WL 4536868 (E.D.N.Y. Aug. 30, 2016) ........................................... 29

*Brown v. Lockheed Martin Corp.,*
814 F.3d 619 (2d Cir. 2016) ............................................................................................... 28, 29

*Caraccioli v. Facebook, Inc.,*
167 F. Supp. 3d 1056 (N.D. Cal. 2016) .................................................................................. 10

*Carafano v. Metrosplash.com, Inc.,*
339 F.3d 1119 (9th Cir. 2003) ................................................................................................. 20

*Chambers v. Time Warner, Inc.,*
282 F.3d 147 (2d Cir. 2002) ...................................................................................................... 4

*Chatwal Hotels & Resorts LLC v. Dollywood Co.,*
No. 14–cv–8679, 2015 WL 539460 (S.D.N.Y. 2015) ............................................................ 29

*Coalition of Watershed Towns v. EPA*,
  552 F.3d 216 (2d Cir. 2008) ........................................................................... 31

*Cont'l Indus. Grp., Inc. v. Equate Petrochemical Co.*,
  586 F. App'x 768 (2d Cir. 2014) ................................................................... 28

*Crandon v. United States*,
  494 U.S. 152 (1990)....................................................................................... 39

*Daimler AG v. Bauman*,
  134 S. Ct. 746 (2014) ............................................................... 27, 28, 29, 30

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006)....................................................................................... 31

*Doe v. Friendfinder Network, Inc.*,
  540 F. Supp. 2d 288 (D.N.H. 2008)............................................................. 17

*Doe v. MySpace, Inc.*,
  528 F.3d 413 (5th Cir. 2008) ........................................................................... 9

*Dowbenko v. Google, Inc.*,
  582 F. App'x 801 (11th Cir. 2014) ............................................................... 16

*EEOC v. Arabian American Oil Co.*,
  499 U.S. 244 (1991)....................................................................................... 21

*Elonis v. United States*,
  135 S. Ct. 2001 (2015)........................................................................... 39, 40

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
  521 F.3d 1157 (9th Cir. 2008) (en banc) ........................................... 12, 14

*Fields v. Twitter*,
  No. 16-cv-00213, 2016 WL 4205687 (N.D. Cal. Aug. 10, 2016) ............... 2, 13, 14, 19, 33, 34

*Finkel v. Facebook, Inc.*,
  No. 102578/09, 2009 WL 3240365 (N.Y. Sup. Ct. Sept. 15, 2009)............................. 2, 10, 11

*Gaston v. Facebook, Inc.*,
  No. 3:12-cv-0063, 2012 WL 629868 (D. Or. Feb. 2, 2012) ........................... 3, 10, 11

*Genuine Parts Co. v. Cepec*,
  No. 528, 2015, 2016 WL 1569077 (Del. Apr. 18, 2016)........................... 29

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
  131 S. Ct. 2846 (2011)................................................................................... 26

*Green v. Am. Online,*
  318 F.3d 465 (3d Cir. 2003) ................................................................................ 9, 12, 18

*Gucci Am., Inc. v. Weixing Li,*
  768 F.3d 122 (2d Cir. 2014) ........................................................................................ 28

*Halberstam v. Welch,*
  705 F.2d 472 (D.C. Cir. 1983) ........................................................... 35, 36, 37, 38

*Holder v. Humanitarian Law Project,*
  561 U.S. 1 (2010) ........................................................................................................ 39

*Hollingsworth v. Perry,*
  133 S. Ct. 2652 (2013) ........................................................................................ 30, 31

*Huon v. Breaking Media, LLC,*
  75 F. Supp. 3d 747 (N.D. Ill. 2014) ........................................................................ 17

*In re Terrorist Attacks on Sept. 11, 2001,*
  349 F. Supp. 2d 765 (S.D.N.Y. 2005),
  *aff'd* 714 F.3d 118 (2d Cir. 2013) ............................................................................ 7

*In re Terrorist Attacks on Sept. 11, 2001,*
  714 F.3d 118 (2d Cir. 2013) ................................................................... 32, 33, 34

*Jane Doe No. 1 v. Backpage.com LLC,*
  817 F.3d 12 (1st Cir. 2016) ...................................................................... 13, 15, 16

*Japan Press Service, Inc. v. Japan Press Service, Inc.,*
  No. 11 CV 5875, 2013 WL 80181 (E.D.N.Y. Jan. 2, 2013) .................................... 24

*Johnson v. Arden,*
  614 F.3d 785 (8th Cir. 2010) ...................................................................................... 9

*Jones v. Dirty World Entm't Recordings LLC,*
  755 F.3d 398 (6th Cir. 2014) .................................................................................... 12

*Kimzey v. Yelp! Inc.,*
  Nos. 14-35487, 14-35494, 2016 WL 4729492 (9th Cir. Sept. 12, 2016) ................ 16

*Kiobel v. Royal Dutch Petroleum Co.,*
  133 S. Ct. 1659 (2013) ........................................................................................ 21, 22

*Klayman v. Zuckerberg,*
  753 F.3d 1354 (D.C. Cir. 2014),
  *cert. denied,* 135 S. Ct. 680 (2014) ........................... 2, 3, 7, 9, 10, 11, 12, 16, 19, 20

*Klayman v. Zuckerberg,*
 910 F. Supp. 2d 314 (D.D.C. 2012),
 *aff'd*, 753 F.3d 1354 (D.C. Cir. 2014) ................................................................. 16

*Lathan v. Lathan,*
 No. 2013-07-3525 (Ohio Ct. Com. Pl. Sept. 30, 2015) ........................................ 3

*Lerner v. Fleet Bank, N.A.,*
 318 F.3d 113 (2d Cir. 2003) ................................................................................ 32

*Levitt v. Yelp! Inc.,*
 No. 10-1321, 2011 WL 5079526 (N.D. Cal. Oct. 26, 2011) .................................. 9

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
 134 S. Ct. 1377 (2014) ......................................................................................... 31

*Lujan v. Defenders of Wildlife,*
 504 U.S. 555 (1992) .................................................................................. 8, 30, 31

*Marvel Characters, Inc. v. Kirby,*
 726 F.3d 119 (2d Cir. 2013) ................................................................................ 23

*Mejia-Haffner v. Killington, Ltd.,*
 990 N.Y.S.2d 561 (N.Y. App. Div. 2014) ........................................................... 25

*Miles v. Raycom Media, Inc.,*
 No. 09CV713, 2010 WL 3419438 (S.D. Miss. Aug. 26, 2010) .............................. 9

*Morrison v. National Australia Bank Ltd.,*
 561 U.S. 247 (2010) ............................................................................................. 22

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.,*
 591 F.3d 250 (4th Cir. 2009) ................................................................................. 9

*Phillips v. Audio Active Ltd.,*
 494 F.3d 378 (2d Cir. 2007) ................................................................................ 10

*PV OSUS Ltd. v. UBS AG,*
 114 F. Supp. 3d 161 (S.D.N.Y. 2015) ................................................................. 30

*Ramey v. Darkside Prods., Inc.,*
 No. 02-730, 2004 WL 5550485 (D.D.C. May 17, 2004) ...................................... 17

*Republic of Austria v. Altmann,*
 541 U.S. 677 (2004) ............................................................................................. 21

*Ricci v. Teamsters Union Local 456,*
 781 F.3d 25 (2d Cir. 2015) ........................................ 1, 2, 7, 9, 10, 12, 14, 18, 19, 21

*RJR Nabisco, Inc. v. European Community*,
  136 S. Ct. 2090 (2016) ............................................................................................ 21

*Roca Labs, Inc. v. Consumer Opinion Corp.*,
  140 F. Supp. 3d 1311 (M.D. Fla. 2015) ................................................................. 17

*Rothstein v. UBS AG*,
  708 F.3d 82 (2d Cir. 2013) ........................................................................... 7, 32, 33

*Schindler Elevator Corp. v. U.S. ex rel. Kirk*,
  563 U.S. 401 (2011) ................................................................................................ 18

*Shiamili v. Real Estate Grp. of N.Y., Inc.*,
  17 N.Y.S.3d 281 (N.Y. 2011) ................................................................................ 16

*Sichkin v. Leger*,
  No. 11-CV-1067, 2012 WL 3150583 (E.D.N.Y. July 31, 2012) ............................ 25

*Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.*,
  No. 15-cv-02442, 2015 WL 7075696 (N.D. Cal. Nov. 13, 2015) ................... 2, 10, 11

*Simmons v. Danhauer & Assocs., LLC*,
  No. 08-CV-03819, 2010 WL 4238856 (D.S.C. Oct. 21, 2010) ................................ 9

*Simon v. E. Ky. Welfare Rights Org.*,
  426 U.S. 26 (1976) .................................................................................................. 31

*Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*,
  450 F.3d 100 (2d Cir. 2006) ................................................................................... 23

*Sonera Holding B.V. v. Cukurova Holding A.S.*,
  750 F.3d 221 (2d Cir. 2014) .............................................................................. 27, 28

*Stern v. Four Points*,
  19 N.Y.S.3d 289 (1st Dep't 2015) .......................................................................... 25

*Strauss v. Credit Lyonnais, S.A.*,
  925 F. Supp. 2d 414 (E.D.N.Y. 2013) .................................................................... 32

*Stroud v. Tyson Foods, Inc.*,
  91 F. Supp. 3d 381 (E.D.N.Y. 2015) ...................................................................... 24

*Tetreau v. Facebook, Inc.*,
  No. 10-4559-CZ (Mich. Cir. Ct. Feb. 23, 2011 .................................................. 3, 11

*Troma Entm't, Inc. v. Centennial Pictures, Inc.*,
  729 F.3d 215 (2d Cir. 2013) ..................................................................................... 8

*TRW Inc. v. Andrews,*
  534 U.S. 19 (2001) ............................................................................................ 20

*Universal Commc'n Sys., Inc. v. Lycos, Inc.,*
  478 F.3d 413 (1st Cir. 2007) .................................................... 9, 12, 13, 16, 17

*Walden v. Fiore,*
  134 S. Ct. 1115 (2014) ...................................................................................... 26

*Waldman v. Palestine Liberation Organization,*
  Nos. 15-3135, 3151, 2016 WL 4537369 (2d Cir. Aug. 31, 2016) .............. 26, 27, 28

*Whitaker v. Am. Telecasting, Inc.,*
  261 F.3d 196 (2d Cir. 2001) .............................................................................. 25

*Zeran v. Am. Online, Inc.,*
  129 F.3d 327 (4th Cir. 1997) ............................................................ 9, 12, 14, 19

**Rules and Statutes**

18 U.S.C. § 2 ............................................................................................................. 36

18 U.S.C. § 2331(1) ................................................................................................... 40

18 U.S.C. § 2331(A) .................................................................................................. 38

18 U.S.C. § 2331(C) .................................................................................................. 38

18 U.S.C. § 2333 ..................................................................................................... 1, 32

18 U.S.C. § 2333(a) ............................................................................ 7, 13, 14, 32, 36

18 U.S.C. § 2339A ................................................................................................. 38, 39

18 U.S.C. § 2339A(a) ................................................................................................ 39

18 U.S.C. § 2339A(b)(1) ........................................................................................... 40

18 U.S.C. § 2339B(a)(1) ........................................................................................... 39

18 U.S.C. § 3 ............................................................................................................. 36

22 U.S.C. § 254d ....................................................................................................... 20

28 U.S.C. § 1350 ....................................................................................................... 22

28 U.S.C. § 1604 ....................................................................................................... 21

47 U.S.C. § 230(a)(3) ................................................................................................ 19

47 U.S.C. § 230(c) ................................................................................................. 14

47 U.S.C. § 230(c)(1) ........................................................... 8, 10, 14, 15, 17, 20

47 U.S.C. § 230(e) ................................................................................................. 20

47 U.S.C. § 230(f)(2) ............................................................................................ 14

47 U.S.C. § 230(f)(2) ............................................................................................ 10

47 U.S.C. § 230(f)(3) ............................................................................................ 17

Fed. R. Civ. P. 12(b)(1) ............................................................................. 8, 30, 40

Fed. R. Civ. P. 12(b)(2) .................................................................................. 8, 40

Fed. R. Civ. P. 12(b)(6) .................................................................................. 8, 40

N.Y. Bus. Corp. Law § 1301 .............................................................................. 28

N.Y. Bus. Corp. Law §§ 1301–1320 ................................................................. 29

N.Y. CPLR 302 ...................................................................................................... 23

N.Y. CPLR 302(a)(1) ..................................................................................... 23, 24

N.Y. CPLR 302(a)(2) ............................................................................................ 24

N.Y. CPLR 302(a)(3) ............................................................................................ 25

Pub. L. No. 114-222 (2016) ........................................................................... 34, 35

**Other Authorities**

Oxford English Dictionary (2d ed. 1988) ......................................................... 18

Webster's New Dictionary (1994) ...................................................................... 18

## INTRODUCTION

Facebook has zero tolerance for terrorism. It condemns terrorist actions, prohibits terrorist content on Facebook, and swiftly removes any reported terrorist content. Yet plaintiffs in these cases accuse Facebook of not doing enough. Indeed, they go so far as to allege that Facebook actively supports terrorists in their deplorable actions. Plaintiffs' theories are implausible on the facts and unsupportable by the law.

The gravamen of each complaint is that Facebook should be held liable because terrorists have allegedly used the Facebook platform to spread their views, recruit followers, and incite violence. In the *Cohen* case, nearly 20,000 Israelis seek to hold Facebook liable for various Israeli torts because terrorists purportedly use Facebook to spread incitement and make connections with other terrorists. In the *Force* case, the families of U.S. citizens killed and injured abroad in terrorist attacks linked to HAMAS likewise seek to hold Facebook liable under Israeli law because HAMAS members and sympathizers have used Facebook as a tool for propagating HAMAS' terrorist message. They further contend that, by failing to block such use, Facebook has aided and abetted, conspired with, and offered material support to HAMAS, and is therefore liable for damages under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333.

Plaintiffs' claims in both cases are barred by § 230 of the Communications Decency Act of 1996 ("CDA"), 47 U.S.C. § 230. As the Second Circuit and courts across the country have held, § 230 insulates providers of social-networking services like Facebook from liability for speech by third-party users of the service. *See Ricci v. Teamsters Union Local 456*, 781 F.3d 25, 28 (2d Cir. 2015). Indeed, lawsuits such as these—which seek to hold Facebook liable for failing to prevent third parties from posting objectionable content on its platform—are precisely what the CDA was enacted to foreclose.

Two other courts have rejected virtually indistinguishable cases under the CDA. The D.C. Circuit concluded that the CDA barred a suit for negligence and intentional assault based on Facebook's alleged delay in removing content that "called for Muslims to rise up and kill the Jewish people." *Klayman v. Zuckerberg*, 753 F.3d 1354, 1355, 1357 (D.C. Cir. 2014), *cert. denied*, 135 S. Ct. 680 (2014). The court explained that the assault claim at issue there "turn[ed] on Facebook's allowing the Third Intifada pages to exist on its website in the first place" and the negligence claim "relie[d] on the timing of Facebook's removal of the pages," classic examples of conduct protected by the CDA. *Id.* at 1359. The Northern District of California likewise concluded that the CDA barred a suit related to alleged terrorist use of social media. *Fields v. Twitter*, No. 16-cv-00213, 2016 WL 4205687 (N.D. Cal. Aug. 10, 2016). There, the plaintiffs alleged that Twitter should be held civilly liable under the ATA for providing Twitter accounts to ISIS. *Id.* The court rejected the theory, reasoning that "Twitter's decision to structure and operate itself as a platform allowing for the freedom of expression of hundreds of millions of people around the world, and to allow even ISIS to sign up for accounts on its social network, reflect choices about what third-party content can appear on Twitter and in what form." *Id.* at *7 (internal citations and alterations omitted). Once again, because classic editorial choices "form[ed] the basis of a plaintiff's claim," such claim could not proceed. *Id.*; *see also Ricci*, 781 F.3d at 28; *Klayman*, 753 F.3d at 1359.

*Klayman* and *Fields* join a veritable mountain of precedents enforcing the CDA in similar circumstances, including many dismissing lawsuits against Facebook in particular. *See, e.g.*, *Finkel v. Facebook, Inc.*, No. 102578/09, 2009 WL 3240365 (N.Y. Sup. Ct. Sept. 15, 2009); *Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.*, No. 15-cv-02442, 2015 WL 7075696, at * 4–*6 (N.D. Cal. Nov. 13, 2015); *Lathan v. Lathan*, No. 2013-07-3525 (Ohio Ct. Com. Pl. Sept. 30,

2015) (attached at Decl. of S. Barday, Ex. C); *Gaston v. Facebook, Inc.*, No. 3:12-cv-0063, 2012 WL 629868, at *6-7 (D. Or. Feb. 2, 2012); *Tetreau v. Facebook, Inc.*, No. 10-4558-CZ (Mich. Cir. Ct. Feb. 23, 2011) (attached at Decl. of S. Barday, Ex. B)).

The result here should be no different. Plaintiffs in each case are seeking to treat Facebook as the publisher of content posted by Palestinian terrorists, and the CDA categorically forbids that treatment. *See* 47 U.S.C. § 230. Whether phrased as a challenge to Facebook's alleged failure "to flag, review, and deny services to users who threaten or call for terrorism," *Cohen* Am. Compl. ¶ 61; *see also Force* Am. Compl. ¶ 547, or its alleged provision of "sophisticated algorithm[s]" that "broker" connections between "terrorist organizations" and those who "sympathize with the terrorist-cause," *Cohen* Am. Compl. ¶¶ 56–57, *see also Force* Am. Compl. ¶ 531, all of plaintiffs' claims seek to impose civil liability for Facebook's decisions about "whether to exclude material that third parties seek to post online." *Klayman*, 753 F.3d at 1359. Those decisions are "the very essence of publishing" behavior, and Facebook's conduct "is perforce immune under section 230." *Id*. (quotation omitted).

In addition to being barred by the CDA, both suits must be dismissed for lack of personal jurisdiction. Facebook is not subject to general jurisdiction in New York, and this suit does not arise out of any of Facebook's limited activities in the State. New York's long-arm statute does not provide for personal jurisdiction over Facebook in this matter, and, even if it did, the Due Process Clause would not allow the exercise of such jurisdiction.

The amended complaints also suffer from individual pleading defects. The *Cohen* amended complaint articulates no basis upon which the 20,000 Israeli plaintiffs have Article III standing. And the *Force* amended complaint fails to state a plausible claim to relief under the

ATA: Facebook's provision of its platform to the general public was not the proximate cause of the terrorist attacks at issue, nor can it give rise to liability for acts of international terrorism.

Facebook is committed to fighting terrorism. It does so aggressively on a daily basis. Instead of assisting Facebook with this fight, these lawsuits seek to hold Facebook responsible for the very conduct it is fighting to prevent. They are barred by the CDA and brought in the wrong forum. Facebook respectfully requests that this Court dismiss them in their entirety.

## BACKGROUND

These suits arise out of certain third parties' use of online social-networking services provided by Facebook, a Delaware corporation headquartered in Menlo Park, California. *Cohen* Am. Compl. ¶ 6; *Force* Am. Compl. ¶¶ 19, 22. Facebook allows people to share content, including articles, photographs, news, and opinions about world and local events. *See generally Cohen* Am. Compl. ¶¶ 41–43; *Force* Am. Compl. ¶¶ 91–94. To access Facebook, one must open an account and agree to abide by its terms of service, including a Statement of Rights and Responsibilities ("SRR"). *Cohen* Am. Compl. ¶ 41; *Force* Am. Compl. ¶¶ 97–98. Facebook is, and always has been, a free service. *Force* Am. Compl. ¶ 99; *cf. Cohen* Am. Compl. ¶ 41. But users must agree not to "post content that: is hate speech, threatening, or pornographic; incites violence; or contains nudity or graphic or gratuitous violence." SRR § 3(7) (attached at Decl. of S. Barday, Ex. A);[1] *see also Force* Am. Compl. ¶ 506 (acknowledging that Facebook's Community Standards prohibit "content encouraging violence, direct threats, terrorism or hate

---

[1] This Court may consider the Statement of Rights and Responsibilities at the motion to dismiss stage because it is incorporated by reference in each complaint, *Cohen* Am. Compl. ¶ 41; *Force* Am. Compl. ¶ 98, or, at a minimum, is integral to their claims that Facebook does not do enough to prevent objectionable content from being posted on Facebook. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002).

speech"). Facebook removes reported objectionable content that violates its policies. *Cohen* Am. Compl. ¶ 62; *Force* Am. Compl. ¶ 545.

### A.    *Cohen* Amended Complaint

Plaintiffs in *Cohen* are approximately 20,000 Israeli citizens residing in Israel. *Cohen* Am. Compl. ¶ 4. They allege that "Israel has been plagued with a new wave of Terror Attacks … carried out by young Palestinian terrorists" since October 1, 2015. *Id.* ¶¶ 12–14. According to plaintiffs, these attacks are "driven by terrorist organizations and entities using social media, including Facebook" to "incite, enlist, organize, and dispatch would-be killers to 'slaughter Jews,'" *id.* ¶ 18. Plaintiffs allege that they "live in real fear of imminent Terror Attacks which could take place anywhere and at any time of day or night," *id.* ¶¶ 23, 37.

The amended complaint seeks to hold Facebook liable in tort for this terrorist content. *See id.* ¶¶ 3, 23, 67–148. Significantly, plaintiffs *do not* allege that Facebook had any role in the creation of these posts. To the contrary, plaintiffs allege that these posts are created *entirely by third parties*—namely, "designated terrorist organizations and their cohorts." *Id.* ¶¶ 23, 35, 59. But plaintiffs contend that Facebook should nonetheless be held liable for providing "services to terrorists promoting Terrorist Incitement" and failing to "flag, review, and deny services to users who threaten or call for terrorism, or offer[] training and instruction to terrorists." *See id.* ¶¶ 59–61. Plaintiffs also seek to hold Facebook liable for its use of "algorithms … to suggest friends, groups, products, services and local events, and target notices and advertisements … to each individual user," *id.* ¶ 46, insofar as those algorithms interact with content provided by alleged terrorists and terrorist sympathizers, *id.* ¶¶ 44–60.

The amended complaint includes eight counts. Plaintiffs contend that Facebook is liable under Israeli law for negligence, breach of statutory duty, and vicarious liability based on the alleged terrorists' use of Facebook to "spread their murderous plans and incite and instruct others

to carry out such plans." *Id.* ¶¶ 76, 93, 103. Plaintiffs also contend that Facebook is liable for

prima facie tort, intentional infliction of emotional distress, aiding and abetting terror networks,

and civil conspiracy. *Id.* ¶¶ 108–109, 116, 123, 130. And plaintiffs seek a declaration that the

CDA does not bar their claims. *Id.* ¶ 148. Plaintiffs request only injunctive relief.

### B.    *Force* Amended Complaint

Plaintiffs in *Force* are relatives of American citizens killed or injured in terror attacks

linked to HAMAS, along with one American citizen who survived such an attack. *Force* Am.

Compl. ¶¶ 5–18, 206, 219–220, 409, 452, 454, 478–85. They allege that "HAMAS is among the

most widely-known Palestinian terrorist organizations in the world," designated by the United

States Government as a Foreign Terrorist Organization since 1997. *Id.* ¶ 2.

According to plaintiffs, HAMAS "has used and relied on Facebook's online social

network platform and communications services as among its most important tools to facilitate

and carry out its terrorist activity, including the terrorist attacks in which HAMAS murdered and

injured the victims and their families in this case." *Id.* ¶ 4. For example, plaintiffs allege that

HAMAS has used Facebook accounts to "shar[e] operational and tactical information with its

members and followers," *id.* ¶ 127; "recruit followers," *id.* ¶ 129; and "disseminate propaganda,"

*id.* ¶ 130; including "graphic images, videos, and music," *id.* ¶ 134. Plaintiffs also contend that

HAMAS "uses Facebook to issue terroristic threats, attract attention to its terror attacks, instill

and intensify fear from terror attacks, intimidate and coerce civilian populations," and otherwise

"carry out the essential communication components of HAMAS's terror attacks." *Id.* ¶¶ 112–13.

Plaintiffs seek to hold Facebook liable for content posted by HAMAS members and

affiliates. As in *Cohen*, the *Force* plaintiffs ***do not*** allege that Facebook had any role in the

creation of HAMAS-related content. *See id.* ¶¶ 100–155. Plaintiffs also admit that Facebook

has "suspended," "shut down," or "blocked" HAMAS-related Facebook pages, but they assert

that Facebook has later "reactivated" some of those pages and has not made "any effective or prolonged effort to ensure that the pages are not re-established using another account." *Id.* ¶ 553.

The amended complaint asserts seven claims. In their first four claims, plaintiffs seek to hold Facebook liable under the civil remedies provision of the ATA, 18 U.S.C. § 2333, contending that Facebook aided and abetted, conspired with, and provided material support to HAMAS. *Force* Am. Compl. ¶¶ 561–585. In their remaining three claims, plaintiffs seek to hold Facebook liable under Israeli law for negligence, breach of statutory duty, and vicarious liability based on the same alleged provision of "material support" and services to HAMAS. *See id.* ¶¶ 594, 606, 617. Plaintiffs seek compensatory damages of "no less than $1 billion," treble damages, punitive damages, and attorney's fees. *Force* Am. Compl. at Prayer for Relief.

## LEGAL STANDARDS ON A MOTION TO DISMISS

On a motion to dismiss for failure to state a claim, the Court must determine whether the amended complaints "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Nor are "legal conclusion[s] couched as ... factual allegation[s]" entitled to a presumption of truth. *Id.* And where, as here, the amended complaints involve the "extreme nature of the charge of terrorism, fairness requires extra-careful scrutiny of Plaintiffs' allegations." *Cf. In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d 765, 831 (S.D.N.Y. 2005), *aff'd* 714 F.3d 118 (2d Cir. 2013); *see also Rothstein v. UBS AG*, 708 F.3d 82, 85 (2d Cir. 2013) (dismissing ATA claims for failure to state a claim). Where a claim is barred by the CDA, dismissal at the pleadings stage is appropriate because there would be no entitlement to relief as a matter of law. *See Ricci*, 781 F.3d at 28; *Klayman*, 753 F.3d at 1357. Dismissal on the

pleadings is also appropriate if the party invoking the Court's jurisdiction has failed to make a prima facie showing of it. *See Troma Entm't, Inc. v. Centennial Pictures, Inc.*, 729 F.3d 215, 218 (2d Cir. 2013); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("The party invoking federal jurisdiction bears the burden of establishing these elements ... with the manner and degree of evidence required at the successive stages of the litigation").

## ARGUMENT

Facebook moves to dismiss the amended complaints for overlapping and individual reasons. *First*, the amended complaints should be dismissed because the CDA bars all of plaintiffs' claims. *See* Fed. R. Civ. P. 12(b)(6). *Second*, the amended complaints should be dismissed because plaintiffs have failed to establish personal jurisdiction over Facebook. *See* Fed. R. Civ. P. 12(b)(2). *Third*, the *Cohen* amended complaint should be dismissed because the *Cohen* plaintiffs lack Article III standing. *See* Fed. R. Civ. P. 12(b)(1). *Fourth*, the *Force* ATA claims should be dismissed for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6).

## I.   The Communications Decency Act Requires Dismissal Of Plaintiffs' Claims.

Plaintiffs' claims must be dismissed under § 230 of the CDA, which bars any cause of action that seeks to hold an interactive-computer-service provider liable for the service provider's decision to allow, edit, or remove content created by a third-party user.

### A.   Section 230 of the CDA Immunizes Providers of Interactive Computer Services from Civil Liability for Content Created by Third-Party Users.

The broad immunity afforded by the CDA stems from the plain language of the statute. Section 230 of the CDA states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). As courts have long recognized, § 230, "[b]y its plain language, ... creates a federal immunity to any cause of action that would make service providers

8

liable for information originating with a third-party user of the service." *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997); *see also Ricci*, 781 F.3d at 27.

The Second Circuit has joined the national "consensus"[2] in applying "the immunity provisions" of the CDA "broadly to effectuate the statute's speech-protective purpose." *Ricci*, 781 F.3d at 28. Recognizing that Congress enacted the CDA in response to "the threat that tort-based lawsuits pose to freedom of speech in the new and burgeoning Internet medium," *id.*, the court affirmed the dismissal of a defamation claim against GoDaddy.com based on statements "republished on a website hosted on GoDaddy's servers," *id.* at 26. The court noted that the plaintiff could sue the original culpable party—the author of the defamatory statements—but it could not sue GoDaddy for its alleged "refus[al] to remove" those statements. *Id.* at 28.

The Second Circuit cited favorably to the D.C. Circuit's decision in *Klayman*, which joined a growing number of decisions recognizing that Facebook in particular is immune from claims analogous to those raised here. *See Klayman*, 753 F.3d at 1357; *Caraccioli v. Facebook,*

---

[2] *See, e.g., Klayman v. Zuckerberg*, 753 F.3d 1354 (D.C. Cir. 2014), *cert. denied*, 135 S. Ct. 680 (2014) (Facebook entitled to CDA immunity from negligence and assault claims for comments posted by third-party users); *Johnson v. Arden*, 614 F.3d 785, 792 (8th Cir. 2010) (internet service provider entitled to CDA immunity in defamation suit for comments posted to message board by third-party users); *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009) (consumer-review website entitled to CDA immunity for tort claims relating to comments posted by third-party users); *Doe v. MySpace, Inc.*, 528 F.3d 413, 415 (5th Cir. 2008) (MySpace immune from negligence suit for failing to prevent 13-year-old from lying about her age to create profile and thus from being sexually assaulted); *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 418-419 (1st Cir. 2007) (operator of internet message board entitled to CDA immunity for suit relating to defamatory postings made by third-party users); *Green v. Am. Online*, 318 F.3d 465, 471 (3d Cir. 2003) (AOL entitled to § 230 immunity in suit alleging liability for messages transmitted through its internet service); *Levitt v. Yelp! Inc.*, No. 10-1321, 2011 WL 5079526, at *9 (N.D. Cal. Oct. 26, 2011) (Yelp! entitled to § 230 immunity in suit alleging that Yelp! unlawfully manipulated the content of its business review pages); *Simmons v. Danhauer & Assocs., LLC*, No. 08-CV-03819, 2010 WL 4238856, at *5 (D.S.C. Oct. 21, 2010) (online auction site immune from claims based on information provided by and actions of third-party user of the site); *Miles v. Raycom Media, Inc.*, No. 09CV713, 2010 WL 3419438, at *3 (S.D. Miss. Aug. 26, 2010) (television station immune from liability under CDA for failing to screen and remove allegedly defamatory comments posted on its website).

*Inc.*, 167 F. Supp. 3d 1056, 1066 (N.D. Cal. 2016); *Sikhs for Justice "SFJ", Inc. v. Facebook, Inc.*, No. 15-cv-02442, 2015 WL 7075696, at *6 (N.D. Cal. Nov. 13, 2015); *Lathan v. Lathan*, No. 2013-07-3525, at *8 (Ohio Ct. Com. Pl. Sept. 30, 2015) (attached at Decl. of S. Barday, Ex. C); *Gaston v. Facebook, Inc.*, No. 3:12-cv-0063, 2012 WL 629868, at *6-7 (D. Or. Feb. 2, 2012); *Tetreau v. Facebook, Inc.*, No. 10-4558-CZ (Mich. Cir. Ct. Feb. 23, 2011) (attached at Decl. of S. Barday, Ex. B); *Finkel v. Facebook, Inc.*, No. 102578/09, 2009 WL 3240365 (N.Y. Sup. Ct. Sept. 15, 2009). No court has expressed any hesitation in concluding that providers of interactive computer services like Facebook are protected by the CDA.

**B.      Section 230 of the CDA Requires Dismissal of Plaintiffs' Claims.**

CDA immunity requires dismissal of plaintiffs' amended complaints. *See Ricci*, 781 F.3d at 29; *Klayman*, 753 F.3d at 1357. Section 230 immunity applies when (1) the defendant is a "provider ... of an interactive computer service"; (2) the plaintiff is attempting to hold the defendant liable as a "publisher or speaker" of allegedly harmful content; and (3) the allegedly harmful content was "provided by another information content provider," and not by the defendant. 47 U.S.C. § 230(c)(1). Those elements are satisfied for each amended complaint.[3]

**1.      Facebook Is a Provider of an Interactive Computer Service.**

Facebook clearly qualifies as a "provider" of an "interactive computer service." 47 U.S.C. § 230(c)(1). The CDA broadly defines "interactive computer service" as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server." *Id.* § 230(f)(2). Facebook, through its website

---

[3] The amended complaints do not specify whether plaintiffs are Facebook users. If they are, their tort claims are governed by California law under the SRR, which includes a California choice-of-law provision that applies to "any claim that might arise between [the user] and [Facebook], without regard to conflict of law provisions." SRR § 15(1) (attached at Decl. of S. Barday, Ex. A). Such choice-of-law provisions are enforceable. *See, e.g., Phillips v. Audio Active Ltd.*, 494 F.3d 378, 384 (2d Cir. 2007) (recognizing "the presumptive validity of choice of law clauses").

and platform, allows users from around the world to access Facebook's servers for the purposes of posting information and sharing that information with others. *See Cohen* Am. Compl. ¶ 41; *Force* Am. Compl. ¶ 521. For that reason, the D.C. Circuit and at least four other courts have ruled that Facebook is a provider of an interactive computer service. *See Klayman*, 753 F.3d at 1357; *Sikhs for Justice*, 2015 WL 7075696, at * 4; *Gaston*, 2012 WL 629868, at *7; *Tetreau*, No. 10-4558-CZ; *Finkel*, 2009 WL 3240365. There is no reason to reach a different conclusion here.

### 2. Plaintiffs Attempt to Hold Facebook Liable as the Publisher or Speaker of the Alleged Terrorist Content.

Plaintiffs in *Cohen* and *Force* plead the same two theories of liability, both of which treat Facebook as the publisher of alleged terrorist content. *First*, plaintiffs seek to hold Facebook liable for failing to "flag, review, and deny services to users who threaten or call for terrorism, or offer[] training and instruction to terrorists." *Cohen* Am. Compl. ¶ 61; *see also Force* Am. Compl. ¶¶ 543, 547 (alleging that Facebook has "refused to actively monitor its online social media network to block HAMAS's use of Facebook" and to "flag, review, and remove HAMAS Facebook accounts"). *Second*, plaintiffs seek to hold Facebook liable for providing "sophisticated algorithm[s] and features" that terrorists use "to more effectively disseminate criminal Terrorist Incitement." *Cohen* Am. Compl. ¶ 56; *see also Force* Am. Compl. ¶ 542 (alleging that Facebook "provid[es] ... a highly-developed and sophisticated algorithm that facilitates HAMAS's ability to reach and engage an audience"). The CDA bars both theories.

*First*, plaintiffs try to hold Facebook liable for failing to "flag" or "remove" content posted by terrorists. *See Cohen* Am. Compl. ¶¶ 3, 61; *Force* Am. Compl. ¶¶ 543–553. That is plainly barred by the CDA. Because "the very essence of publishing is making the decision whether to print or retract a given piece of content," challenges to failure to remove content on a platform necessarily treat the platform provider as the "publisher" of the content. *Klayman*, 753

11

F.3d at 1359; *see also Zeran*, 129 F.3d at 330 ("[L]awsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content—are barred."). The Second Circuit reached this very conclusion when it held that the CDA barred a claim alleging that GoDaddy "refused to remove" certain content from its platform. *Ricci*, 781 F.3d at 28. Numerous other courts have concluded similarly. *See, e.g.*, *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 416 (6th Cir. 2014) ("[A]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230." (quoting *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1170–71 (9th Cir. 2008) (en banc))); *Green v. Am. Online*, 318 F.3d 465, 470 (3d Cir. 2003) ("holding AOL liable for its alleged negligent failure to properly police its network for content transmitted by its users … would 'treat' AOL 'as the publisher or speaker' of that content").

Plaintiffs cannot plead around the CDA by recasting their claims as challenges to Facebook's provision of services. *See, e.g.*, *Cohen* Am. Compl. ¶ 66 ("If only Facebook had from the beginning fulfilled its duty to deny its services to Palestinian terrorists, the 'Facebook Intifada' would not have happened."); *Force* Am. Compl. ¶ 547 ("Facebook has refused to actively monitor its online social media network to block HAMAS's use of Facebook."). "[D]ecisions regarding the construct and operation" of a website are just as protected as decisions about any particular piece of content. *Universal Commc'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 422 (1st Cir. 2007). In *Lycos*, for example, the plaintiffs alleged that Lycos' registration process did "not prevent a single individual from registering under multiple screen names," a feature of the website that "ma[d]e it possible for individuals to spread misinformation more credibly, by doing so under multiple screen names." *Id.* at 420. The First Circuit rejected

this claim, noting that "Lycos's decision not to reduce misinformation by changing its web site policies was as much an editorial decision with respect to that misinformation as a decision not to delete a particular posting." *Id.* at 422. "Section 230 immunity does not depend on the form that decision takes." *Id.*; *see also Jane Doe No. 1*, 817 F.3d 12, 20 (1st Cir. 2016) ("Features … [that] reflect choices about what content can appear on the website and in what form, are editorial choices that fall within the purview of traditional publisher functions.").

Even plaintiffs' "services" theory attempts to treat Facebook as the publisher of alleged terrorist content on its platform. The "service[]" that Facebook provides to registered users is "the ability to create personal on-line pages with information about themselves, ... [and] to create networks of Facebook 'friends' (who are also registered users) with whom they can share personal Facebook 'posts.'" *Cohen* Am. Compl. ¶ 42; *see also Force* Am. Compl. ¶ 522 (same). The only reason that plaintiffs object to the provision of that service is because of the ***content*** posted by alleged terrorists using that service. *See, e.g., Cohen* Am. Compl. ¶ 58 ("The sophisticated features of Facebook are [] used by Palestinian terrorists for communications, intelligence, and logistical purposes, to recruit, train, and instruct followers, to plan, incite, and mobilize attacks, to raise funds, and much more."); *Force* Am. Compl. ¶ 130 ("HAMAS has used Facebook to disseminate propaganda and messages to its followers and the public."). Plaintiffs' theory is thus ultimately a challenge to third-party content on Facebook's platform.

A district court in the Northern District of California recently dismissed a complaint for this very reason. *See Fields v. Twitter*, 2016 WL 4205687, at *1. In a case directly analogous to *Force*, the families of two U.S. citizens killed by ISIS sought to hold Twitter liable under the ATA, 18 U.S.C. § 2333(a) "on the theory that Twitter provided material support to ISIS by allowing ISIS to sign up for and use Twitter accounts, and that this material support was a

13

proximate cause of the" attacks. *Id.* The court explained that the theory of the complaint was not that "Twitter provides material support to ISIS by providing it with Twitter accounts, but that Twitter does so by 'knowingly permitt[ing] [ISIS] to use [those accounts] as a tool for spreading extremist propaganda, raising funds, and attracting new recruits.'" *Id.* at *6 (alterations in original). That theory undeniably sought to "treat Twitter as a publisher [of the objectionable content] and [wa]s barred by Section 230(c)(1)." *Id.* And even if the plaintiffs had more directly challenged the provision of accounts, "it would be just as barred by section 230(c)(1)" because the provision of an account is permission to post and is therefore just as much the "publishing activity" of deciding "what third-party content may be posted online." *Id.*

The statute could not be interpreted otherwise. By **definition**, any "provider . . . of an interactive computer service" provides a **service**. 47 U.S.C. §§ 230(c), (f)(2). If plaintiffs could evade the CDA's immunity by recasting their claims as challenges to the provision of those "services," CDA immunity would be meaningless. That is surely not what Congress intended. "By its plain language, § 230 creates a federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service." *Zeran*, 129 F.3d at 330; *see also Ricci*, 7871 F.3d at 28. Even close cases "must be resolved in favor of [that] immunity, lest [courts] cut the heart out of section 230 by forcing websites to face death by ten thousand duck-bites, fighting off claims that they promoted or encouraged—or at least tacitly assented to—the illegality of third parties." *Fair Hous. Council*, 521 F.3d at 1174.

*Second*, Facebook cannot be held liable for use of neutral algorithms that suggest content to users. *See Cohen* Am. Compl. ¶¶ 47–57; *Force* Am. Compl. ¶ 542. These algorithms, according to plaintiffs, "utilize the data [Facebook] collects to suggest friends, groups, products, services and local events, and target notices and advertisements that will be 'as relevant and

interesting' as possible to each individual user." *Cohen* Am. Compl. ¶ 46; *Force* Am. Compl. ¶ 530. Plaintiffs' object to these neutral algorithms only insofar as they interact with and republish allegedly objectionable content. The *Cohen* plaintiffs allege that "Palestinian terrorists … take advantage of the fact that Facebook will purposefully suggest, for example, groups, events, pages, and posts promoting and inciting 'intifada', 'Jew killing', 'stabbing', etc., to users who have viewed, 'liked', or shared pages on those subjects, or who have joined similar groups, or attended similar events." *Cohen* Am. Compl. ¶ 49. Likewise, the *Force* plaintiffs allege that Facebook's "highly-developed and sophisticated algorithm … facilitates HAMAS's ability to reach and engage an audience it could not otherwise reach as effectively." *Force* Am. Compl. ¶ 542. In other words, plaintiffs complain that the neutral algorithms republish terrorism-related content to users who have interacted with other similar content. The trouble with this theory is that, once again, it relies on treating Facebook as the publisher of the objectionable content.

The First Circuit's recent decision in *Jane Doe No. 1 v. Backpage.com LLC*, 817 F.3d 12 (1st Cir. 2016), illustrates the point. There, the plaintiffs attempted to identify "'an affirmative course of conduct' … distinct from the exercise of the 'traditional publishing or editorial functions' protected under the CDA." *Id.* at 20. Specifically, they sued Backpage for sex trafficking, alleging that Backpage had, "with an eye to maximizing its profits, engaged in a course of conduct designed to facilitate sex traffickers' efforts to advertise their victims on the website." *Id.* at 16. The First Circuit nevertheless affirmed dismissal of the claims, explaining that the claims "treat[ed] Backpage as the publisher or speaker of the content of" the sex-trafficking advertisements at issue: "Since the [plaintiffs] were trafficked by means of these advertisements, there would be no harm to them but for the content of the postings." *Id.* at 19–20. "[T]he 'publisher or speaker' language of section 230(c)(1) extends to the formulation of

15

precisely the sort of website policies and practices that the appellants assail." *Id.* at 20; *see also Lycos*, 478 F.3d at 422 (same); *Kimzey v. Yelp! Inc.*, Nos. 14-35487, 14-35494, 2016 WL 4729492, at *5 (9th Cir. Sept. 12, 2016) (rejecting challenge to Yelp's "neutral" star-rating tool).

The First Circuit's analysis applies equally here. Facebook's neutral algorithms work only in conjunction with information and content provided by others. The neutral algorithms would cause no alleged harm to the plaintiffs if not for the objectionable content. There would be no "connections" brokered but for that content. *See Cohen* Am. Compl. ¶ 137; *see also Force* Am. Compl. ¶ 532. Liability for providing those algorithms thus depends on treating Facebook as the publisher of the objectionable content.

The district court in *Klayman* reached the same conclusion. The plaintiff in that case argued that Facebook was not entitled to immunity under § 230 because Facebook "collect[ed] data from Facebook users and then us[ed] that data 'to make suggestions' to users about content in which the users might be interested." *Klayman v. Zuckerberg*, 910 F. Supp. 2d 314, 321 & n.3 (D.D.C. 2012), *aff'd*, 753 F.3d 1354 (D.C. Cir. 2014). The court rejected that theory as based "on the role that the defendants played in *publishing* the Facebook page." *Id.*

This conclusion is confirmed by the *numerous* decisions holding that the very same actions accomplished by the algorithms—the editing and reposting of third-party content—are "well within 'a publisher's traditional editorial functions.'" *Shiamili v. Real Estate Grp. of N.Y., Inc.*, 17 N.Y.3d 281, 291 (N.Y. 2011); *see also Kimzey*, 2016 WL 4729492, at *5 ("Nothing in the text of the CDA indicates that immunity turns on how many times an interactive computer service publishes 'information provided by another information content provider.'"); *Dowbenko v. Google, Inc.*, 582 F. App'x 801, 805 (11th Cir. 2014) (rejecting effort to hold Google liable for allegedly "manipulat[ing] its search results to prominently feature" an objectionable article);

*Roca Labs, Inc. v. Consumer Opinion Corp.*, 140 F. Supp. 3d 1311, 1319–20 (M.D. Fla. 2015) (trimming and reposting posts on Twitter is protected by the CDA); *Huon v. Breaking Media, LLC*, 75 F. Supp. 3d 747, 760 (N.D. Ill. 2014) (editing of allegedly defamatory third-party comments was publisher function); *Doe v. Friendfinder Network, Inc.*, 540 F. Supp. 2d 288, 295 (D.N.H. 2008) (reposting information in "teasers" is publisher function).

In sum, the weight of precedent forecloses plaintiffs' algorithm theory. The only harm that plaintiffs allege from the algorithms is caused by the objectionable third-party content— because the only action the algorithms perform is the editing and reposting of third-party content. Plaintiffs' theory thus requires Facebook to be treated as the publisher of that content. "If the cause of action is one that would treat the service provider as the publisher of a particular posting, immunity applies not only for the service provider's decisions with respect to that posting, but also for its inherent decisions about how to treat postings generally." *Lycos*, 478 F.3d at 422. The CDA protects Facebook's use of algorithms to sort content on its platform.

### 3. The Allegedly Harmful Content Was Provided by a Third-Party Facebook User, and Not by Facebook Itself.

The final element for CDA immunity is likewise easily met. It is beyond dispute that the objectionable content forming the basis of plaintiffs' claims was all "provided by ***another*** information content provider," not by Facebook itself. 47 U.S.C. § 230(c)(1) (emphasis added). The CDA defines an "information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development" of the statements at issue, *id.* § 230(f)(3), and courts give that definition a narrow construction, *Ramey v. Darkside Prods., Inc.*, No. 02-730, 2004 WL 5550485, at *7 (D.D.C. May 17, 2004). The amended complaints are devoid of any allegation that Facebook is "responsible," even "in part," for the "creation or development" of content posted by terrorists on Facebook. *Id.* at *5. To the contrary, plaintiffs' claims relate

solely to information provided by third parties. *See, e.g., Cohen* Am. Compl. ¶ 18; *Force* Am. Compl. ¶ 112. The CDA thus requires dismissal of the complaints. *Ricci*, 781 F.3d at 28.

### C.     The *Cohen* Plaintiffs' Attempts to Evade the CDA Are Unavailing.

Recognizing the clear preclusive effect of the CDA's terms, the *Cohen* plaintiffs advance three reasons that the statute should not apply to their claims: (1) the objectionable content posted by terrorists is not "information" within the meaning of the CDA, *Cohen* Am. Compl. ¶ 138; (2) application of the CDA to their claims would result in an overly broad reading of the statute, *id.* ¶ 139; and (3) § 230 does not "preempt[] or supersede[]" laws of foreign states, such as the State of Israel, *id.* ¶ 147. None of these arguments is supported by the statute.[4]

*First*, plaintiffs argue that the "type of instructional material and specific calls to murderous action that comprise the Terrorist Incitement" is not "'information' within the meaning of [§ 230]," *id.* ¶ 138, but that argument is foreclosed by ordinary principles of statutory interpretation. Where a term in a statute is undefined, courts "look first to the word's ordinary meaning." *Schindler Elevator Corp. v. U.S. ex rel. Kirk*, 563 U.S. 401, 407 (2011). Here, that meaning is quite broad: The Oxford English Dictionary defines "information" as "knowledge communicated concerning some particular fact, subject, or event; that of which one is apprised or told." Oxford English Dictionary (2d ed. 1988); *see also* Webster's New Dictionary (1994) ("telling; what is told, knowledge"). That broad meaning fits naturally within the text, and it effectuates the purpose of the statute, which is to "maintain the robust nature of Internet communication" and protect "the messenger." *See Ricci*, 781 F.3d at 28; *Green*, 318 F.3d at 471 (noting that a narrow interpretation of the word "information" to exclude a "punter" computer program "would run afoul of the intention of section 230"). Neither the D.C. Circuit in

---

[4] Although the *Force* plaintiffs do not make any of these arguments in their complaint, the arguments would likewise fail as applied to the *Force* amended complaint.

18

*Klayman*—cited approvingly by the Second Circuit in *Ricci*—nor the Northern District of California in *Fields* had any trouble applying the CDA to terrorism-related content, and neither should this Court. *Klayman*, 753 F.3d at 1358; *Fields*, 2016 WL 4205687, at \*4–\*6.

*Second*, plaintiffs argue that only an "overly broad" interpretation of the CDA would apply to their claims, *Cohen* Am. Compl. ¶ 139, but this interpretation is routine. Although the CDA was adopted to encourage "a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity," § 230(a)(3), the CDA's language is in no way limited to suits involving content that can be proven to serve that purpose. Congress "made a policy choice ... not to deter [even] *harmful online speech* through the ... route of imposing tort liability on companies that serve as intermediaries for other parties' *potentially injurious messages*." *Ricci*, 781 F.3d at 28 (emphasis added). Broad CDA immunity is what allows Facebook to offer its vibrant platform for political discourse, cultural development, and intellectual activity in the first place. The Fourth Circuit explained it best:

> Interactive computer services have millions of users. The amount of information communicated via interactive computer services is therefore staggering. The specter of tort liability in an area of such prolific speech would have an obvious chilling effect. It would be impossible for service providers to screen each of their millions of postings for possible problems. Faced with potential liability for each message republished by their services, interactive computer service providers might choose to severely restrict the number and type of messages posted. Congress considered the weight of the speech interests implicated and chose to immunize service providers to avoid any such restrictive effect.

*Zeran*, 129 F.3d at 331. Congress' choice was effective. Interactive computer services have grown dramatically over the last 20 years, providing ever greater access to the "'free marketplace of ideas' that is the cornerstone of American democracy," *Cohen* Am. Compl. ¶ 143. Plaintiffs' interpretation of the CDA, if accepted, would be inconsistent with congressional intent and threaten that marketplace.

19

*Third*, assuming for the sake of argument that Israeli law actually applies to plaintiffs' claims, the CDA would apply equally to them. The CDA instructs courts in this country that they may not treat a provider of an interactive computer service "as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). It establishes a broad immunity, subject to specified exceptions for federal criminal law, federal intellectual property law, state laws that can be construed consistently with CDA immunity, and the Electronic Communications Privacy Act. *Id.* § 230(e). If Congress had wanted to create an exception for foreign law, it could have added it to that list. Because it did not, such exception does not exist. *See TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.").

To interpret the CDA as including an exception for foreign-law claims would also produce anomalous results. Numerous courts have recognized that the CDA applies to state-law claims concerning conduct abroad. *See, e.g., Klayman*, 753 F.3d at 1356 (suit concerning "Third Palestinian Intifada" page); *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1121, 1125 (9th Cir. 2003) (suit concerning false dating profile posted in Berlin). To read into the CDA an exception for foreign-law claims would create a situation in which courts of this country are ***required*** to entertain claims asserted under foreign law, yet ***forbidden*** from entertaining claims based on the same conduct asserted under federal or state law. Facebook is aware of no other context in which American courts (state or federal) are faced with such a requirement. Quite the contrary, other forms of immunity from suit—like foreign sovereign immunity and diplomatic immunity—apply equally to claims under state, foreign, and international law. *See, e.g.*, 22 U.S.C. § 254d (instructing courts to dismiss "*[a]ny action* or proceeding brought against an

individual" entitled to diplomatic immunity); *Republic of Austria v. Altmann*, 541 U.S. 677, 685, 700 (2004) (applying the Foreign Sovereign Immunities Act, 28 U.S.C. § 1604, to claims under foreign law).

A foreign-law exception would also conflict with the purpose of the CDA. "Congress recognized the threat that tort-based lawsuits pose to freedom of speech in the new and burgeoning Internet medium," and it "made a policy choice ... not to deter harmful online speech through the ... route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages." *Ricci*, 781 F.3d at 28 (internal quotation marks omitted). Allowing plaintiffs to plead around the CDA by invoking foreign law would create a significant loophole for creative plaintiffs armed with a comparative law textbook.

The presumption against extraterritoriality does not require any such loophole, and in fact has no application to the CDA. As the Supreme Court recently explained, the presumption against extraterritoriality is a canon of construction that assists courts in trying to determine "whether an Act of Congress regulating conduct *applies abroad*." *See Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1664 (2013) (emphasis added). "Absent clearly expressed congressional intent to the contrary, [such] laws will be construed to have only domestic application." *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090, 2100 (2016). Thus, the Supreme Court relied on the presumption to conclude that Title VII's prohibition on discriminatory practices could not be applied abroad, *see EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 249 (1991), *superseded by statute as stated in Arbaugh v. Y&H Corp.*, 546 U.S. 500, 512 n.8 (2006), and to hold that the Securities Exchange Act's prohibition on deceptive conduct in connection with the purchase or sale of securities applies only to "transactions in securities listed on domestic exchanges, and domestic transactions in other securities," *Morrison*

*v. National Australia Bank Ltd.*, 561 U.S. 247, 266-67 (2010). But the presumption is not relevant when the question is how a U.S. law applies to regulate conduct in the United States. *See Kiobel*, 133 S. Ct. at 1664. Application of CDA immunity by a court in New York to claims asserted against a California corporation does not raise an issue of extraterritoriality.

The Supreme Court's recent discussion of the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, illustrates the distinction between laws that implicate the presumption and laws—like the CDA—that do not. In *Kiobel*, "a group of Nigerian nationals residing in the United States[] filed suit in federal court against certain Dutch, British, and Nigerian corporations" under the ATS, "alleging that the corporations aided and abetted the Nigerian Government in committing violations of the law of nations in Nigeria," *Kiobel*, 133 S. Ct. at 1662. The corporations argued that the presumption against extraterritoriality precluded courts from recognizing causes of actions for violations of the law of nations occurring extraterritorially. *Id.* at 1663. The Supreme Court disagreed, explaining that the presumption did not apply because the ATS "does not directly regulate conduct or afford relief," but merely "allows federal courts to recognize certain causes of action based on sufficiently definite norms of international law." *Id.* at 1664.[5] The CDA likewise "does not directly regulate conduct or afford relief" and is not subject to the presumption. Plaintiffs cannot evade the CDA by bringing their claims under Israeli law.

## II.    This Court Cannot Exercise Personal Jurisdiction Over Facebook.

The amended complaints fail for still a more fundamental reason: In each case, plaintiffs have failed to make a prima facie showing that this Court can exercise personal jurisdiction over

---

[5] The court went on to invoke the principles underlying the presumption to "constrain courts considering causes of action that may be brought under the ATS," recognizing the danger of unwarranted judicial interference in foreign policy posed causes of action that reach[] conduct within the territory of another sovereign." *Kiobel*, 133 S. Ct. at 1664. No similar danger is presented by the application of the CDA *in U.S. courts*, as that application actually *prevents* courts from "reach[ing] conduct within the territory of another sovereign." *See id.* at 1665.

Facebook consistent either with New York's long-arm statute or due process. *See Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 127–28 (2d Cir. 2013).[6]

**A.    New York's Long-Arm Statute Does Not Permit Exercise of Specific Jurisdiction Over Facebook in This Case.**

Plaintiffs do not allege any facts that would support jurisdiction under New York's long-arm statute. *See* N.Y. CPLR 302(a). Specific jurisdiction is appropriate under that statute only if a cause of action arises out of a defendant's "transact[ion of] any business within the state"; "tortious act within the state"; or, in certain circumstances, "tortious act without the state causing injury to person or property within the state." *Id.* None of those facts is present here.

*First*, none of plaintiffs' claims arise from Facebook's business in New York. CPLR 302(a)(1) authorizes the exercise of jurisdiction over a non-domiciliary that transacts business in New York where the action "arise[s] directly out of this transaction." *Arroyo v. Mountain Sch.*, 892 N.Y.S.2d 74, 76 (1st Dep't 2009). "New York courts have held that a claim 'aris[es] from' a particular transaction when there is 'some articulable nexus between the business transacted and the cause of action sued upon,' or when 'there is a substantial relationship between the transaction and the claim asserted.'" *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 249 (2d Cir. 2007) (quoting *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006)). Plaintiffs do not allege that any of Facebook's decisions governing who may post on their platform, what content may be posted, or how that content will be shared with others on the platform occurred in New York. Plaintiffs thus have not shown that their claims arise out of

---

[6] At least some plaintiffs may also have agreed to pursue any claims against Facebook in California. Facebook users agree to "resolve any claim, cause of action or dispute (claim) [they] have with [Facebook] arising out of or relating to [the Statement of Rights and Responsibilities] or Facebook exclusively in the U.S. District Court for the Northern District of California or a state court located in San Mateo County." SRR § 15.1 (attached at Decl. of S. Barday, Ex. A). Such forum-selection clauses are enforceable. *Atlantic Marine Constr. Co. v. U.S. Dist. Ct. for the W. Dist. of Tex.*, 134 S. Ct. 568, 583 (2013). If, as seems likely, some plaintiffs are Facebook users, the forum-selection clause will provide a reason for this Court to transfer the action.

any business transacted by Facebook in New York. *See, e.g., Stroud v. Tyson Foods, Inc.*, 91 F. Supp. 3d 381, 390 (E.D.N.Y. 2015) (no jurisdiction in suit about "masticated chicken nuggets" served at a Wendy's in Georgia absent a showing that those claims arose out of the defendants' New York activities); *Japan Press Service, Inc. v. Japan Press Service, Inc.*, No. 11 CV 5875, 2013 WL 80181, at *9 (E.D.N.Y. Jan. 2, 2013) (no articulable nexus between the use of trademarks in Hawaii and business conducted by a joint venture in New York).

The *Cohen* plaintiffs argue that "Facebook has established an 'Engineering Hub' in New York," but they likewise fail to connect their claims to that alleged "Hub." According to plaintiffs, the "'Engineering Hub' is directly responsible for developing and improving certain Facebook services that are of particular benefit to Palestinian terrorists," such as "Facebook's mobile infrastructure" and "Messenger communications service." *Cohen* Am. Compl. ¶ 8. Plaintiffs' claims, however, arise out of Facebook's decisions relating to alleged terrorist content posted on those services, not any issue with the services themselves. *Id.* ¶¶ 1, 65–66. Plaintiffs thus have not alleged personal jurisdiction under CPLR 302(a)(1).

*Second,* plaintiffs have not alleged that their actions arise out of any tortious activities committed by Facebook in New York. *See* CPLR 302(a)(2) (providing for specific jurisdiction over a non-domiciliary that commits a tortious act within the state). Plaintiffs challenge the alleged provision of services to Palestinian terrorists ***abroad***. *See Cohen* Am. Compl. ¶¶ 18, 40; *Force* Am. Compl. ¶¶ 2–3. They do not connect such provision of services to New York, and their claims therefore do not fall within CPLR 302(a)(2). *See Japan Press Serv.*, 2013 WL 80181, at *9 ("Since plaintiff has not alleged any tortious act committed by defendant while it was physically present in New York, Section 302(a)(2) does not confer personal jurisdiction over defendant in this action.").

*Third*, plaintiffs do not allege that any purported injury occurred in New York. *See* CPLR 302(a)(3) (providing, under certain conditions, for specific jurisdiction over a non-domiciliary that commits a tortious act outside the state that causes injury within the state). Here, the *Cohen* plaintiffs allege injury only *in Israel*. *Cohen* Am. Compl. ¶ 5 (alleging that the Israeli plaintiffs fear for their lives and safety). The *Force* plaintiffs allege injury in *Israel*, *id.* ¶¶ 201, 303, 305, 308, 421, 457–460 (alleging that plaintiffs domiciled in Israel suffered physical and emotional harm from the terrorist attacks), and *in South Carolina*, *id.* ¶¶ 5–6, 489–91 (alleging that Taylor Force's family members, domiciled in South Carolina, "suffered severe psychological and emotional injuries as a result of the attack" that killed Taylor). Injuries that occur outside of New York cannot provide a basis for the exercise of specific jurisdiction under New York law. *See, e.g.*, *Stern v. Four Points*, 19 N.Y.S.3d 289, 290 (1st Dep't 2015).

In sum, New York's long-arm statute does not authorize jurisdiction over Facebook. *See Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 209 (2d Cir. 2001) (holding that plaintiff "failed to allege New York injury and hence, a factual predicate sufficient to authorize jurisdiction over [the defendant] under the New York long arm statute"); *Stern*, 19 N.Y.S.3d at 290 (booking an out-of-state hotel room was too remote a contact to justify jurisdiction over defective-premises suit); *Mejia-Haffner v. Killington, Ltd.*, 990 N.Y.S.2d 561, 564 (N.Y. App. Div. 2014) (maintaining a website accessible in New York was insufficient to support long-arm jurisdiction for negligence associated with ski instructors out of state). Plaintiffs' claims must be dismissed. *See Sichkin v. Leger*, No. 11-CV-1067, 2012 WL 3150583, at *3 (E.D.N.Y. July 31, 2012).

### B.    Subjecting Facebook to Jurisdiction Here Would Violate Due Process.

Even if plaintiffs could overcome the hurdle of New York law, they would be unable to overcome the hurdle of the Due Process Clause of the Fourteenth Amendment. That Clause imposes limits on the exercise of "specific or case-linked jurisdiction" and "general or all-

25

purpose jurisdiction. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011). Generally, a court may assert specific jurisdiction over a foreign corporation based on "an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Id.*; *see also Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014). A court may assert general jurisdiction only when a corporation's "affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State." *Goodyear*, 131 S. Ct. at 2851. Plaintiffs have identified a basis for neither form of jurisdiction.

### 1. Due Process Does Not Permit the Exercise of Specific Jurisdiction over Facebook in this Action.

For much the same reason that New York's long-arm statute does not cover this suit, the exercise of specific jurisdiction would not comport with Due Process. A state may not assert jurisdiction over an out-of-state defendant unless the defendant's suit-related conduct arises out of a substantial relationship that the defendant has created with the forum State. *Walden*, 134 S. Ct. at 1122. Plaintiffs have alleged *no* connection between the "suit-related conduct"— Facebook's alleged provision of services to ***Palestinian*** terrorists—and New York. *See id.* at 1121. Plaintiffs have thus failed to establish the "substantial connection" necessary to support specific jurisdiction over Facebook in New York. *See Walden*, 134 S. Ct. at 1121.

The Second Circuit emphasized the importance of this substantial connection in *Waldman v. Palestine Liberation Org.*, Nos. 15-3135, 15-3151, 2016 WL 4537369, at *15 (2d Cir. Aug. 31, 2016). There, eleven American families sued the Palestine Liberation Organization and the Palestinian Authority under the ATA "for various terror attacks in Israel that killed or wounded the plaintiffs ... or their family members." *Id.* at *1. The Second Circuit explained that "[a] focus on the relationship of the defendants, the forum, and the defendants' suit-related

26

conduct points to the conclusion that there is no specific personal jurisdiction over the defendants for the torts in this case." *Id.* at *15. The attacks "occurred *entirely* outside the territorial jurisdiction of the United States," *id.* at *14, "were unconnected to the forum[,] and were not expressly aimed at the United States," *id.* at *15. Due process accordingly would not permit the suit to be brought in New York. *See id.* at *20; *see also 7 West 57th Street Realty Co., LLC v. Citigroup, Inc.*, No. 13 Civ. 981, 2015 WL 1514539, at *10 (S.D.N.Y. Mar. 31, 2015) (no personal jurisdiction where plaintiff did not "demonstrate the necessary connection between [the defendant's] alleged suit-related conduct and New York, much less that any relationship between this conduct and New York arose out of contacts that [the defendant] created with New York"). The same can be said about the attacks described in the *Cohen* and *Force* complaints, and the same conclusion on personal jurisdiction should result.

### 2. Due Process Would Not Permit the Exercise of General Jurisdiction over Facebook in New York.

Plaintiffs also have not established a basis for the exercise of general jurisdiction. The Supreme Court made clear in *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014), that a corporation is "at home" in its "place of incorporation and principal place of business," *id.* at 760. Only in an "exceptional case" can a corporation be found "at home" in another state. *Id.* at 761 n.19; *see also Sonera Holding B.V. v. Cukurova Holding A.S.*, 750 F.3d 221, 225 (2d Cir. 2014) (same). Facebook is a global company incorporated in Delaware with its principal place of business in California, *Cohen* Am. Compl. ¶ 6; *Force* Am. Compl. ¶ 19, and those states are its paradigm forums for general jurisdiction, *Daimler*, 134 S. Ct. at 760; *Waldman*, 2016 WL 4537369, at *12.

Facebook's relatively minor contacts with New York do not make this an "exceptional case" in which it can be found "at home" in a place other than its principal place of business or place of incorporation. *Daimler*, 134 S. Ct. at 761 n.19. "A corporation that operates in many

places can scarcely be deemed at home in all of them." *Id.* at 762 n.20; *accord id.* ("General jurisdiction . . . calls for an appraisal of a corporation's activities in their entirety, nationwide and worldwide."). Facebook's contacts with New York are relatively limited. Facebook does not own real property in the state, choosing to lease its office space in New York. Decl. of D. So ¶¶ 4–5. None of its data centers is located in New York. *Id.* ¶ 7. And Facebook's California headquarters is more than ten times larger than its office in New York. Decl. of J. Farren ¶¶ 5–6. Facebook has not "transported [its] princip[al] 'home' to [New York], even temporarily." *Waldman*, 2016 WL 4537369, at *13. Facebook's contacts thus "fall short of those required to render it at home in New York," and subjecting Facebook to "all-purpose general jurisdiction in th[e] state would deny it due process." *Sonera*, 750 F.3d at 226; *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 135 (2d Cir. 2014); *Cont'l Indus. Grp., Inc. v. Equate Petrochemical Co.*, 586 F. App'x 768, 769–70 (2d Cir. 2014).

### C. Facebook Did Not Consent to Personal Jurisdiction in New York.

Plaintiffs cannot escape this problem by alleging that Facebook "consented" to general jurisdiction when it registered to do business here, N.Y. Bus. Corp. Law § 1301. *See Cohen* Am. Compl. ¶ 6; *Force* Am. Compl. ¶ 22. Business registration statutes have historically been treated as consent to *specific* jurisdiction, not to *general* jurisdiction. *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 632–33 (2d Cir. 2016). "[E]very state in the union—and the District of Columbia, as well—has enacted a business registration statute." *Id.* at 640. To find that such registration constitutes consent to general jurisdiction "would risk unraveling the jurisdictional structure envisioned in *Daimler* and *Goodyear*," rendering a corporation "subject to general jurisdiction in

28

every state in which it [is] registered" and "robb[ing] [*Daimler*] of meaning." *Id.* at 639–40[7];

*Genuine Parts Co. v. Cepec*, No. 528, 2015, 2016 WL 1569077 (Del. Apr. 18, 2016).

Recognizing this problem, the Second Circuit recently interpreted the Connecticut

business registration statute to give rise only to ***specific*** jurisdiction. *See Brown*, 814 F.3d 619 at

623. In *Brown*, the plaintiff argued that Lockheed Martin, "a major aerospace company with a

worldwide presence . . . incorporated and maintain[ing] its principal place of business in

Maryland," was subject to general jurisdiction in Connecticut because it had registered to do

business there. *Id.* at 622. The court examined the registration statute, noting that it "nowhere

expressly provide[d] that foreign corporations that register to transact business in the state shall

be subject to the 'general jurisdiction' of the Connecticut courts or directs that Connecticut

courts may exercise their power over registered corporations on any cause asserted by any

person." *Id.* at 634. The statute could not be used as evidence of such consent. *Id.* at 623.

The same is true of the New York business registration statutes. Those statutes do not

speak clearly on the issue of consent to general jurisdiction. *See generally* N.Y. Bus. Corp. Law

§§ 1301–1320. Several courts have thus recently declined to interpret them to confer such

jurisdiction. *See, e.g.*, *Bonkowski v. HP Hood LLC*, No. 15-CV-4946, 2016 WL 4536868, at *3

(E.D.N.Y. Aug. 30, 2016) ("Finding neither controlling case law nor a scintilla of discussion on

this point from either party, the Court declines to give New York's statutory [business

registration] scheme such an expansive reading."); *Chatwal Hotels & Resorts LLC v. Dollywood

Co.*, No. 14–cv–8679, 2015 WL 539460, at *6 (S.D.N.Y. 2015) ("After *Daimler*, with the

---

[7] Although not mentioned in *Daimler*, it seems likely that the subsidiary whose contacts with
California the Court found insufficient to ground general jurisdiction *was* registered to do
business in that state. The subsidiary was "the largest supplier of luxury vehicles to the
California market" and had multiple facilities in the state, 134 S. Ct. at 752, and California, like
New York, generally requires foreign limited liability companies to register to transact business
there, *see* Cal. Corp. Code §§ 17708.02, 17708.03.

Second Circuit cautioning against adopting an overly expansive view of general jurisdiction, the mere fact of Herschend's being registered to do business is insufficient to confer general jurisdiction in a state that is neither its state of incorporation or its principal place of business." (internal citation omitted)); *SPV OSUS Ltd. v. UBS AG*, 114 F. Supp. 3d 161, 168 (S.D.N.Y. 2015) ("Plaintiffs argue that UBS AG has offices in New York, conducts substantial business here, has a registered agent here, and has been the subject of many suits in New York courts. However, at most, the contacts alleged by plaintiffs amount to 'a substantial, continuous, and systematic course of business,' which the Supreme Court expressly held to be insufficient in *Daimler*."). This Court should do likewise.

### III. The *Cohen* Plaintiffs Lack Article III Standing to Bring Their Suit.

The *Cohen* amended complaint must be dismissed in its entirety for yet a third reason: the *Cohen* plaintiffs lack Article III standing to pursue their claims. See Fed. R. Civ. P. 12(b)(1). The rules of Article III standing are familiar: A plaintiff must "prove that he has suffered a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision." *Hollingsworth v. Perry*, 133 S. Ct. 2652, 2661 (2013). The *Cohen* plaintiffs have failed adequately to plead any of these elements.

To begin, plaintiffs have failed to allege a particularized injury. An injury-in-fact is one that affects a plaintiff "in a 'personal and individual way.'" *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 n.1 (1992). "[A] 'generalized grievance,' no matter how sincere, is insufficient to confer standing," *id.*, yet a generalized grievance is all that plaintiffs have alleged: Plaintiffs—nearly 20,000 Israelis—assert that they fear for their lives and safety because "[t]he threat of being killed or seriously injured in terrorist attacks has spread to every sector of Israeli society." *Cohen* Am. Compl. ¶ 5. "So pervasive is the fear of terrorist attacks that few Israelis venture outside of their homes, schools or offices." *Id.* No matter how sincere these allegations,

they amount only to the sort of grievance that each plaintiff "suffers ... in common with people generally" in Israel. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 344 (2006). And the relief that plaintiffs seek "no more directly and tangibly benefits [each individual plaintiff] than it does the public at large." *Hollingsworth*, 133 S. Ct. at 2662.

Plaintiffs also have failed to plead that their injury is "fairly traceable to the challenged action of the defendant, and not ... the result of the independent action of some third party not before the court." *Defenders of Wildlife*, 504 U.S. at 560. The fear that plaintiffs allege is a direct result of independent action—specifically, terror attacks "carried out by young Palestinians." *Cohen* Am. Compl. ¶¶ 14–15. Although plaintiffs allege that incitement on Facebook "encourage[d]" these attacks, *id.* ¶ 18, it does not follow that the attacks "in fact result[ed] from" that incitement. *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 42 (1976). It "is purely speculative whether the [terror attacks] specified in the complaint fairly can be traced to [the] 'encouragement' or instead result[ed] from decisions made by [the terrorists] without regard to" that purported encouragement. *Id.*; *see also Allen v. Wright*, 468 U.S. 737, 759 (1984) ("The links in the chain of causation between the challenged ... conduct and the asserted injury are far too weak for the chain as a whole to sustain respondents' standing."), *abrogated on other grounds*, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014).

Finally, plaintiffs have not plausibly alleged that the injury they experienced will be redressed by a favorable decision. Plaintiffs do not allege that the injunction they request would stop the terror attacks that cause their fear, nor even reduce them. Plaintiffs therefore have not adequately alleged that the relief they seek would remedy their injury. *See Coalition of Watershed Towns v. EPA*, 552 F.3d 216, 218 (2d Cir. 2008) (concluding that plaintiffs did not

have Article III standing where it was wholly "speculative" that plaintiffs would "be in any different position than they are now" upon favorable decision).

Because plaintiffs lack Article III standing, this Court cannot adjudicate their claims.

**IV.     The *Force* Plaintiffs Have Failed To State A Claim Under Section 2333.**

With respect to the *Force* amended complaint, the first four counts fail for yet another reason—failure to state a claim under the ATA.  The civil-remedies provision of the ATA creates a private cause of action for "[a]ny national of the United States injured in his or her person, property, or business by reason of an act of international terrorism."   18 U.S.C. § 2333(a). Plaintiffs fail to allege that any such injuries occurred "by reason of" Facebook's activities or that those activities constituted "an act of international terrorism."

**A.     Plaintiffs Have Not Plausibly Alleged That Their Injuries Occurred "By Reason Of" Facebook's Activities.**

The Second Circuit has held that § 2333's "'by reason of' language … restricts the imposition of … liability [under the statute] to situations where plaintiffs plausibly allege that defendant's actions proximately caused their injuries." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 123–25 (2d Cir. 2013) (hereinafter, "*Al Rajhi Bank*"); *Rothstein v. UBS AG*, 708 F.3d 82, 95–97 (2d Cir. 2013).  This standard is borrowed from RICO, *Rothstein*, 708 F.3d at 95, and generally requires a plaintiff to show that the defendant's alleged violation "led directly to the plaintiff's injuries," *Rothstein*, 708 F.3d at 91 (quoting *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 461 (2006)).  The defendant's activities must be "'a substantial factor in the sequence of responsible causation,'" and the injury must be "'reasonably foreseeable or anticipated as a natural consequence.'"  *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 432 (E.D.N.Y. 2013) (quoting *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 123 (2d Cir. 2003)).

Plaintiffs have failed to allege such proximate cause. Nothing that Facebook allegedly did "led directly" to the terrorist attacks. Although plaintiffs provide numerous examples of alleged HAMAS-related content on Facebook, they do not connect that content to the attacks. They do not, for example, allege that Facebook "was a participant in the terrorist attacks that injured plaintiffs [or their loved ones]" or that it funded those attacks. *Rothstein*, 708 F.3d at 97. Indeed, given the kind of services Facebook offers, plaintiffs cannot even plausibly allege that Facebook's conduct was a but-for cause of the attacks, let alone a "substantial factor in the sequence of reasonable causation" leading to them. *See id.* Conclusory assertions that Facebook "proximately caused the damages to plaintiffs," *Force* Am. Compl. ¶ 584, or that its actions "facilitated acts of terrorism," *id.* ¶ 576, cannot fill the pleading gap. *See Rothstein*, 708 F.3d at 97 (rejecting conclusory allegations); *see also Al Rajhi Bank*, 714 F.3d at 124 (same).

*Fields* is once again instructive. *Fields*, 2016 WL 4205687, at *8. There, plaintiffs alleged that Twitter was liable for an ISIS shooting attack because it had "knowingly permit[ted] [ISIS] to use [Twitter accounts] as a tool for spreading extremist propaganda, raising funds, and attracting new recruits." *Id.* at *6. The court rejected this theory, reasoning that "[n]owhere in their opposition brief or FAC do plaintiffs explain how Twitter's mere provision of Twitter accounts to ISIS ... proximately caused the November 2015 shooting." *Id.* Plaintiffs did "not allege that ISIS recruited or communicated with [the shooter] over Twitter, that ISIS or [the shooter] used Twitter to plan, carry out, or raise funds for the attack, or that [the shooter] ever viewed ISIS-related content on Twitter or even had a Twitter account." *Id.*

The *Fields* analysis applies equally here. Plaintiffs have failed to connect Facebook to the causal chain of these attacks. At most, plaintiffs allege that some[8] of the attackers used Facebook, but even those allegations establish that the attackers had preexisting ties to HAMAS. *See, e.g., id.* ¶¶ 222, 456, 492, 425. Such allegations do not come close to satisfying basic pleading requirements, let alone the heightened scrutiny applicable to their complaint. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007); *Al Rajhi Bank*, 714 F.3d at 124 (rejecting the suggestion that "providing routine banking services to organizations and individuals said to be affiliated with al Qaeda—as alleged by plaintiffs—proximately caused the September 11, 2001 attacks"); *In re Terrorist Attacks on Sept. 11, 2001*, 349 F. Supp. 2d at 831 (heightened scrutiny for terrorism allegations). For this reason alone, all four of plaintiffs' ATA claims fail.

### B.    Plaintiffs Have Not Plausibly Alleged Secondary Liability Under the ATA.

Plaintiffs have likewise failed to state a claim for secondary liability. The ATA allows for such liability "[i]n an action … for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization … as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism." Justice Against Sponsors of Terrorism Act ("JASTA"), Pub. L. No. 114-222, § 4 (2016). Facebook neither aided and abetted the attackers nor in any way conspired with them.

### 1.    Facebook Did Not Aid and Abet the Perpetrators of the Attacks.

The amended complaint does not plausibly allege that Facebook aided and abetted the perpetrators of the attacks. JASTA provides for such liability only when a person "knowingly provid[es] substantial assistance … [to] the person who committed" the act of international

---

[8] Plaintiffs do not allege that the men who kidnapped and murdered Yaakov Naftali Fraenkel used Facebook. *See Force* Am. Compl. ¶¶ 166–187.

terrorism causing injury. *Id.* § 4. Congress instructed that secondary liability under the ATA should be interpreted in accordance with "*Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983)," JASTA § 2(5), which explains that "substantial assistance" is determined by evaluating six factors: "the nature of the act encouraged; the amount [and kind] of assistance given; the defendant's absence or presence at the time of the tort; his relationship to the tortious actor;" "the defendant's state of mind"; and the "duration of the assistance provided," *Halberstam*, 705 F.2d at 484. *Halberstam* also clarifies that the "knowledge" required for aiding and abetting is not merely knowledge of that substantial assistance given, but also knowledge of the defendant's "role as part of an overall illegal or tortious activity at the time he provides the assistance." *Id.* at 487–88. Here, plaintiffs can show neither substantial assistance, nor the requisite knowledge.

### a.   Facebook Did Not Provide Substantial Assistance.

None of the *Halberstam* factors suggests that Facebook gave "substantial assistance" to the perpetrators of the attacks. The first two  factors—the nature of the act and the amount and kind of assistance—make clear that any assistance provided by Facebook is not the type of assistance that "might matter" to the attacks. *See id.* at 484. The five attacks at issue in the complaint were accomplished by: (1) kidnapping hitchhiking teenagers, *Force* Am. Compl. ¶¶ 177–182; (2) driving a car into a crowded light rail station, *id.* ¶¶ 286–289; (3) boarding a bus and shooting and stabbing its passengers, *id.* ¶ 409; (4) stabbing a man on the street, *id.* ¶¶ 453–454; and (5) stabbing pedestrians on a boardwalk, *id.* ¶¶ 478–482. Plaintiffs do not allege that the attacks were planned, financed, or executed through Facebook, or that they would not have occurred but for the perpetrators' access to Facebook. Indeed, plaintiffs do not even allege that the men who kidnapped and murdered Naftali Fraenkel ever used or viewed Facebook.[9]

---

[9] The allegation that "HAMAS used Facebook to call for Palestinians to destroy surveillance videos" during the Israeli search for Naftali Fraenkel does not establish any assistance, as the

Plaintiffs' allegations do not establish that provision of Facebook's services was "indisputably important," "key," or an "essential part" of those attacks. *See Halberstam*, 705 F.2d at 484, 488.

Consideration of the remaining factors—presence at the tort, relationship to the tortfeasor, state of mind, and duration of assistance—confirms that Facebook did not substantially assist the perpetrators of the attacks. Facebook was not present at the attacks. It had *no* relationship with the perpetrators of the first attack, and its only relationship with the remaining perpetrators was as an internet service provider to its registered users. A relationship that Facebook shares with billions of people is not a "special relationship" establishing "substantial assistance," no matter its duration. *See id.* at 484. Nor can it establish the requisite state of mind—Facebook may not even have accurate identifying information about its users, let alone knowledge of their tortious activities. *See, e.g., Force* Am. Compl. ¶ 228. It certainly cannot be said to be "one in spirit" with such activities. *See Halberstam*, 705 F.2d at 484.

Plaintiffs also cannot establish substantial assistance by pitching their allegations at assistance to "HAMAS" rather than to the "HAMAS operatives" who committed the attacks. *Cf. Force* Am. Compl. ¶ 568. Aiding and abetting liability requires the defendant to "knowingly and substantially assist *the principal violation*." *Halberstam*, 705 F.2d at 488. Here, the principal violations were the individual attacks. But even if one were to consider assistance to HAMAS generally, plaintiffs' claims would fail. Access to Facebook's platform is simply not the kind of assistance that would have mattered to these terrorist attacks, and expressions of support *after* the attacks do not establish aiding and abetting *before* the attacks.

---

crime was already completed. *See Force* Am. Compl. ¶ 199. Aiding and abetting liability is distinct from liability for accessories after the fact. *Compare, e.g.,* 18 U.S.C. § 2 *with* 18 U.S.C. § 3. Only the former is available under the ATA. *See* JASTA § 4; 18 U.S.C. § 2333(a).

### b.    Facebook Did Not Possess the Requisite Knowledge.

Plaintiffs also fail to allege the requisite knowledge.  Unlike the defendant in *Halberstam* who acted "as banker, bookkeeper, recordkeeper, and secretary … in an unusual way under unusual circumstances for a long period of time" to launder stolen goods, 705 F.2d at 487, Facebook offered its social media platform to the general public, subject to its generally applicable policies. *Force* Am. Compl. ¶¶ 97, 99.  It informed the public that "[t]here is no place for content encouraging violence, direct threats, terrorism or hate speech on Facebook," *id.* ¶ 506, and it reviewed and removed content reported to violate that standard. *See id.* ¶¶ 506, 508, 548, 551.  Nothing about its behavior gives rise to an inference of knowledge that Facebook was participating in "an overall illegal or tortious activity." *Halberstam*, 705 F.2d at 488.

Nor do plaintiffs' allegations about the specific uses of Facebook by HAMAS operatives give rise to such an inference.  Plaintiffs do not allege that Facebook knew that any of the perpetrators of the attacks were members of HAMAS, that any of the perpetrators were planning a terrorist attack, or even that any of the perpetrators had posted objectionable content. *See Force* Am. Compl. ¶ 548 (alleging that Facebook "has generally only reviewed HAMAS's use of Facebook in response to third party complaints").  They also do not allege that HAMAS itself was ever provided an account in its own name. *See id.* ¶¶ 120–124.  Even accepting as true plaintiffs' allegations about supposed HAMAS members or affiliate organizations using Facebook, the clear statement of Facebook's representative that Facebook "do[es]n't allow terrorist groups to be on Facebook" and that "[t]here are no pages of Hamas on Facebook," *id.* ¶ 554, negates any inference that Facebook *knew* itself to be providing services to HAMAS.

### 2.    Facebook Did Not Conspire with the Perpetrators of the Attacks.

Plaintiffs also have not plausibly alleged that Facebook conspired with the perpetrators of the attacks.  Looking again to *Halberstam*, a claim of civil conspiracy requires "an agreement to

37

do an unlawful act or a lawful act in an unlawful manner; an overt act in furtherance of the agreement by someone participating in it; and injury caused by the act." 705 F.2d at 487. Absent direct evidence of an agreement, courts generally "look to see if the alleged joint tortfeasors are pursuing the same goal—although performing different functions—and are in contact with one another." *Id.* at 481. Plaintiffs do not allege—nor could they—that Facebook is pursuing a goal of terrorism. *See id.* Plaintiffs also do not allege—nor could they—that Facebook's activities are "symbiotic" with the commission of terror attacks. *See id.* at 487. Terror attacks have been occurring since long before Facebook was ever invented, and nothing about offering an online social network platform creates an inference of support for terrorism, much less an agreement to commit terror attacks. Because plaintiffs have not plausibly alleged an agreement, their civil conspiracy claim must be dismissed. *See id.* at 477.

### C.   Plaintiffs Also Have Not Plausibly Alleged Direct Liability for an "Act of International Terrorism."

Plaintiffs also do not state a claim for direct liability. As distinct from secondary liability under JASTA, direct liability requires plaintiffs to establish that Facebook *itself* committed an act of "international terrorism." The ATA defines "international terrorism" as activities that (A) "involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State"; (B) "appear to be intended" to achieve certain specified terrorist purposes—i.e., "to intimidate or coerce a civilian population," "to influence the policy of a government by intimidation or coercion," or "to affect the conduct of a government by mass destruction, assassination, or kidnapping"; and (C) occur primarily outside the United States or transcend national boundaries. 18 U.S.C. § 2331(A)-(C). Plaintiffs argue that Facebook committed an act of international terrorism by providing "material support" to terrorists or designated terrorist organizations, 18 U.S.C. §§ 2339A, 2339B, but that theory fails.

To begin, Facebook has not violated either material support statute. Section 2339A, upon which Count III rests, requires a showing that the defendant provided material support "knowing or intending that [it] be used in preparation for, or in carrying out [an act of terrorism]." *See* 18 U.S.C. § 2339A(a). Section 2239B, upon which Count IV rests, requires that a defendant "knowingly provide[d] material support" to a designated foreign terrorist organization. § 2339B(a)(1). Disregarding threadbare assertions, *Force* Am. Compl. ¶¶ 1, 4, 504, 548, 568, the amended complaint is devoid of facts necessary to show ***knowing*** provision of support. *Iqbal*, 556 U.S. at 678. Plaintiffs admit that Facebook actively removes terrorist content, and that Facebook has publicly stated that it "do[es]n't allow terrorist groups"—including HAMAS—"to be on Facebook." *See Force* Am. Compl. ¶¶ 548–554. In more than one hundred pages of allegations, plaintiffs identify not a single account used by HAMAS ***itself*** that Facebook knew of and failed to take action against or knowingly allowed to be created in the first place. Instead, plaintiffs try to build their claim from allegations about pages owned by supposed HAMAS leaders and sympathizers. *See, e.g., id.* ¶¶ 550, 552. But even accepting as true that those individuals and organizations are in fact affiliates of HAMAS, *see id.* ¶¶ 120–124, plaintiffs have not alleged that ***Facebook*** knew them to be so.

If there were any doubt on this score, it would be settled by the rule that *mens rea* requirements in criminal statutes must be construed in favor of the defendant. *See Elonis v. United States*, 135 S. Ct. 2001, 2009 (2015); *Crandon v. United States*, 494 U.S. 152, 168 (1990) (noting that the rule of lenity applies when construing a criminal statute even in the civil context); *id.* at 175, 178 (Scalia, J., concurring in the judgment) (same). An appropriate mental state is "necessary to separate wrongful conduct from otherwise innocent conduct." *Elonis*, 135 S. Ct. at 2010. Given the wide range of conduct that could potentially qualify as "material

support," 18 U.S.C. § 2339A(b)(1), generalized allegations of knowledge like those advanced by plaintiffs "would fail to protect the innocent actor." *See Elonis*, 135 S. Ct. at 2010. Hotels do not provide material support by offering lodging to the public, even if they know that members of a terrorist organization sometimes use that lodging. Likewise, wireless carriers do not provide material support by offering their networks to the public, even if they know that members of a terrorist organization sometimes communicate over those networks.

Moreover, even if plaintiffs could show that Facebook violated the material support statutes—again, they cannot—they would still have failed to demonstrate that Facebook's provision of services involved "violent acts or acts dangerous to human life," or was "intended (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping." 18 U.S.C. § 2331(1). Providing access to Facebook's social media platform is not an inherently violent or dangerous act. The platform is not a weapon. It is a forum for free expression and ideas. It would be absurd to interpret the ATA to provide civil liability for the very type of activities that Congress enacted the CDA to protect and encourage. Facebook has committed no violation of the ATA, and those claims must be dismissed.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the *Cohen* amended complaint for lack of subject-matter jurisdiction, personal jurisdiction, and failure to state a claim, Fed. R. Civ. P. 12(b)(1), (2), (6), and the *Force* amended complaint for lack of personal jurisdiction and failure to state a claim, Fed. R. Civ. P. 12(b)(2), (6).

Dated:  November 8, 2016

Respectfully submitted,

By: _____

Shireen A. Barday
Aulden Burcher-DuPont
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-6460
shireen.barday@kirkland.com

Craig S. Primis, P.C.
K. Winn Allen
Jennifer M. Bandy
KIRKLAND & ELLIS LLP
655 Fifteenth Street, N.W.
Washington, D.C.  20005
Telephone: (202) 879-5000
Facsimile: (202) 879-5200
craig.primis@kirkland.com

*Attorneys for Defendant*