UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
RACHELI COHEN, et al.,

Plaintiffs,

**MEMORANDUM & ORDER**

-against-

**16-CV-4453 (NGG) (LB)**

FACEBOOK, INC.,

Defendant.
-------------------------------------------------------------------X
STUART FORCE, individually and as
Administrator on behalf of the Estate of Taylor
Force, et al.,

Plaintiffs,

**16-CV-5158 (NGG) (LB)**

-against-

FACEBOOK, INC.,

Defendant.
-------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiffs in the above-captioned related actions assert various claims against Facebook,

Inc. ("Facebook") based on their contention that Facebook has supported terrorist organizations

by allowing those groups and their members to use its social media platform to further their

aims. The plaintiffs in the first action (the "Cohen Action") are roughly 20,000 Israeli citizens

(the "Cohen Plaintiffs"). (Cohen Am. Compl. ("Cohen FAC") (Dkt. 17), No. 16-CV-4453.) The

second action (the "Force Action") is brought by victims, estates, and family members of victims

of terrorist attacks in Israel (the "Force Plaintiffs" and, together with the Cohen Plaintiffs,

"Plaintiffs"). (Force Am. Compl. ("Force FAC") (Dkt. 28), No. 16-CV-5158.)

1

Before the court are Facebook's motions to dismiss the operative complaints in both actions pursuant to Federal Rules of Civil Procedure 12(b)(1), (2), and (6) (as to the Cohen Action) and 12(b)(2) and (6) (as to the Force Action). (Cohen Def. Mot. to Dismiss ("Cohen MTD") (Dkt. 23), No. 16-CV-4453; Force Def. Mot. to Dismiss ("Force MTD") (Dkt. 34), No. 16-CV-5158.) Because of the substantial similarity in facts and the legal issues raised, the court addresses these motions together in this Memorandum and Order.

For the following reasons, the court GRANTS Facebook's motions to dismiss the operative complaints in both the Cohen Action and the Force Action.

I.    BACKGROUND

A.    Facebook's Social Media Platform

Facebook's eponymous social media website allows users to create personalized webpages that contain information about themselves, including identifying information, photographs, videos, interests, recent activities, and links to content from other websites. (Cohen FAC ¶ 42; see also Force FAC ¶¶ 94-95, 522.) Once a user joins the website, they can engage with other Facebook users in a number of ways, including by adding those users as "friends" and providing feedback to content provided by other users by "sharing," "liking" (i.e. applying a tag that is shared with other users), or commenting on that content. (Cohen FAC ¶ 42; Force FAC ¶ 523.) Additionally, users are able to view their contacts' activities on the website, including both information posted by those contacts as well as their contacts' interactions with other users and content. (See Cohen FAC ¶ 42; Force FAC ¶¶ 524, 527.)

Facebook users are also able to create "groups" with other users, which allows multiple users to join a shared website which has its own profile and information. (Cohen FAC ¶ 43; Force FAC ¶ 525-26.) Members of a group can view, interact with, and share content posted in these group forums. (Cohen FAC ¶ 43.)

2

Facebook collects data as to its users' activities through the website, including but not limited to information regarding contacts and group associations, content that users post and interact with, and use of third party websites. (Cohen FAC ¶ 44; Force Compl ¶ 528.) Using proprietary algorithms, Facebook generates targeted recommendations for each user, promoting content, websites, advertisements, users, groups, and events that may appeal to a user based on their usage history. (Cohen FAC ¶¶ 45-48; Force FAC ¶¶ 529-41.) In this way, Facebook connects users with other individuals and groups based on projected common interests, activities, contacts, and patterns of usage. (Cohen FAC ¶ 48; Force FAC ¶¶ 530-33.) Facebook also presents users with content posted by other users, groups, and third parties (e.g., advertisers) that is likely to be of interest to them, again based on prior usage history. (Cohen FAC ¶¶ 53-55; Force FAC ¶¶ 534-41.)

## B. The Plaintiffs

The Cohen Plaintiffs are 20,000 individuals residing in Israel who state that they "have been and continue to be targeted by" attacks by Palestinian terrorist organizations. (Cohen FAC ¶ 4.) The Cohen Plaintiffs claim that they are "presently threatened with imminent violent attacks that are planned, coordinated, directed, and/or incited by terrorist users of Facebook." (Id. ¶ 5.) In particular, they claim to be threatened by an outbreak of violence by Palestinian groups—which they sometimes refer to as the "Facebook Intifada"—and their Complaint recounts 54 separate attacks by Palestinian terrorists and terror groups in Israel since October 1, 2015. (Id. ¶¶ 11-16.)

Unlike the Cohen Plaintiffs, who claim to be threatened only by potential future attacks, the Force Plaintiffs are the estates of victims (and, in one case, the surviving victim) of past attacks by the Palestinian terrorist organization Hamas and the family members of those victims. (Force FAC ¶¶ 5-18). The victims were U.S. citizens, most of whom were domiciled in Israel at

3

the time of the attacks.  (See id.)  In their Complaint, the Force Plaintiffs describe the attacks that harmed them, providing a detailed timeline of the events and Hamas's particular involvement in the attacks.  (See generally id. ¶¶ 156-499.)

## C.    Allegations Against Facebook

Plaintiffs in the two actions make substantially similar allegations as to Facebook's role in their alleged harms.  Plaintiffs claim that Palestinian terrorists[1] "use Facebook's social media platform and communications services to incite, enlist, organize, and dispatch would-be killers to 'slaughter Jews.'" (Cohen FAC ¶ 18; see also Force FAC ¶ 362.)  They further aver that Palestinian terrorist groups and associated individuals use their Facebook pages for general and specific incitements to violence and to praise past terrorist attacks.  (See Cohen Compl ¶¶ 23-36; Force FAC ¶¶ 111-15.)  Plaintiffs allege that Facebook's algorithms, used to connect users with other users, groups, and content that may be of interest to them, play a vital role in spreading this content, as Palestinian terrorist organizations are able to "more effectively disseminate [incitements to violence], including commands to murder Israelis and Jews, to those most susceptible to that message, and who most desire to act on that incitement." (Cohen FAC ¶ 56; see also Force FAC ¶¶ 530-41.)

Plaintiffs allege that Facebook is aware of the use of its platform by Palestinian terrorist organizations and their members but has failed to take action to deactivate their accounts or prevent them from inciting violence.  (Cohen FAC ¶ 40; Force FAC ¶ 502-04.)  In the case of Hamas, the Force Complaint alleges that Facebook allows that organization, its members, and affiliated organizations to operate Facebook accounts in their own names, despite knowledge that many of them have been officially named as terrorists and sanctioned by various governments.

---

[1] While the Cohen Complaint refers to Palestinian terrorists and terrorist groups generally, the allegations in the Force Complaint are specific to Hamas, and references to both Complaints together should be read accordingly.

(See Force FAC ¶¶ 118-25.) Plaintiffs claim that Facebook's approach to addressing this use of

the platform has been piecemeal (intermittently deleting individual postings or banning users)

and inconsistent (e.g., deleting offending posts from one individual without removing identical

messages or banning users without taking steps to ensure that the same person does not

subsequently rejoin the website under a different moniker). (Id. ¶¶ 549-55; see also Cohen

FAC ¶¶ 40, 61-62.)

## II.   PROCEDURAL HISTORY

The Cohen Plaintiffs originally filed their action in the Supreme Court of New York,

Kings County, and it was removed to this court by Facebook on August 10, 2016, on the basis of

diversity of citizenship. (Not. of Removal (Dkt. 1), No. 16-CV-4453.) The operative complaint

in this action is the First Amended Complaint, filed on October 10, 2016. (See generally Cohen

FAC.) The Cohen Plaintiffs bring Israeli law claims of negligence, breach of statutory duty, and

vicarious liability (id. ¶¶ 67-106), as well as New York law claims for prima facie tort,

intentional infliction of emotional distress, aiding and abetting a tort, and civil conspiracy

(id. ¶¶ 107-34). The Cohen Plaintiffs seek only declaratory and injunctive relief.

(Id. ¶¶ 149-55.) Separate from their substantive claims for relief, the Cohen Complaint requests

a judicial declaration that the causes of action noted above are not barred by Section 230(c)(1) of

the Communications Decency Act, 47 U.S.C. § 230. (Id. ¶¶ 135-48)

The Force Plaintiffs filed their action in the United States District Court for the Southern

District of New York on July 10, 2016. (See generally Force Compl. (Dkt. 1), No. 16-CV-5158.)

The case was subsequently transferred to this court as related to the Cohen Action on

September 16, 2016. (Sept. 16, 2016, Order Reassigning Case (Dkt. 15).) The operative

complaint is the First Amended Complaint, filed on October 10, 2016. (Force FAC.) Like the

Cohen Complaint, the Force Complaint brings claims for negligence, breach of statutory duty,

and vicarious liability under Israeli law. (Id. ¶¶ 586-620.) The Force Complaint also raises claims under the civil enforcement provisions of the federal Anti-Terrorism Act ("ATA") and the Justice Against Sponsors of Terror Act for aiding and abetting acts of international terrorism, conspiracy in furtherance of acts of international terrorism, and providing material support to terrorist groups in violation of 18 U.S.C. §§ 2339A and 2339B. (Id. ¶¶ 561-85.) The Force Plaintiffs seek $1 billion in compensatory damages, punitive damages to be determined at trial, and treble damages for violations of the federal anti-terrorism statutes. (Id. at ECF p.123.)

## III. DISCUSSION

Before the court are Facebook's motions to dismiss the operative complaints in each of the two actions. (Cohen MTD; Force MTD.) Facebook moves to dismiss the Cohen Complaint for lack of subject matter and personal jurisdiction and for failure to state a claim upon which relief may be granted pursuant to Rules 12(b)(1), (2), and (6) of the Federal Rules of Civil Procedure. (Cohen MTD; see also Mem. in Supp. of Def. Mot. to Dismiss ("MTD Mem.") (Dkt. 24), No. 16-CV-4453.)[2] Facebook separately moves to dismiss the Force Complaint for lack of personal jurisdiction and failure to state a claim upon which relief may be granted pursuant to Rules 12(b)(2) and (6). (Force MTD; see also MTD Mem.)

A court facing challenges as to both its jurisdiction over a party and the sufficiency of any claims raised must first address the jurisdictional question. See Arrowsmith v. United Press Int'l, 320 F.2d 219, 221 (2d Cir. 1963). However, there is no such required ordering as between questions of personal and subject matter jurisdiction. Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 586-87 (1999); Carver v. Nassau Cty. Interim Fin. Auth., 730 F.3d 150, 156

---

[2] The parties briefed the motions to dismiss together, and their filings in support of and opposition to Facebook's motions to dismiss appear in identical form on both the Cohen and Force dockets. In order to avoid confusion, the court's citations to Facebook's Memorandum in Support of the Motions to Dismiss, Plaintiffs' Response in Opposition to the Motions to Dismiss, and Facebook's Reply are to the entries on the Cohen docket.

(2d Cir. 2013) (holding that courts "are not bound to decide any particular jurisdictional question before any other").

The court concludes that the Cohen Plaintiffs lack standing to bring their claims and so dismisses their Complaint in its entirety for lack of subject matter jurisdiction. The court finds that it has personal jurisdiction over Facebook with respect to the claims in the Force Complaint but that the action must be dismissed for failure to state a claim, as Facebook makes out a sufficient affirmative defense pursuant to Section 230(c)(1) of the Communications Decency Act.

### A. Subject Matter Jurisdiction

Facebook first argues that the Cohen Plaintiffs lack standing to bring their challenges in federal court, as they fail to point to an injury which is either distinguishable from the harm faced by the public at large, fairly traceable to Facebook's actions, or redressable through relief against the company. (See MTD Mem. at 30-32.) The court does not address the potential traceability or redressability issues, as it concludes that the Cohen Plaintiffs do not allege a cognizable "injury-in-fact" and so fail to establish standing.

### 1. Legal Standard

"A case is properly dismissed for lack of subject matter jurisdiction . . . when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. United States, 201 F.3d 110, 113 (2d Cir. 2000). "The plaintiff bears the burden of alleging facts that affirmatively and plausibly suggest that it has standing to sue," Cortlandt St. Recovery Corp. v. Hellas Telecomms. S.a.r.l., 790 F.3d 411, 417 (2d Cir. 2015) (internal quotation marks, alterations, and citation omitted), a burden which it must satisfy by a preponderance of the evidence, Luckett v. Bure, 290 F.3d 493, 496-97 (2d Cir. 2002). Courts must "accept as true all material factual allegations in the complaint . . . . [but] jurisdiction must be shown affirmatively,

7

and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it." Shipping Fin. Servs. Corp. v. Drakos, 140 F.3d 129, 131 (2d Cir. 1998); accord Morrison v. Nat'l Austl. Bank Ltd., 547 F.3d 167, 170 (2d Cir. 2008), aff'd, 561 U.S. 247 (2010).

Federal jurisdiction is constitutionally constrained to "cases" and "controversies," one element of which requires plaintiffs before the court to establish standing: a "genuinely personal stake" in the outcome of a case sufficient to "ensure[] the presence of 'that concrete adverseness which sharpens the presentation of issues upon which [a] court so largely depends.'" Cortland St. Recovery, 790 F.3d at 417 (quoting Baker v. Carr, 369 U.S. 186, 204 (1962)). "In its constitutional dimension, standing imports justiciability," Warth v. Seldin, 422 U.S. 490, 498 (1975), and objections to standing are properly made under Rule 12(b)(1), as they are directed at the court's ability to adjudicate an issue as to parties before it, see, e.g., Tasini v. N.Y. Times Co., 184 F. Supp. 2d 350, 354-55 (S.D.N.Y. 2002).

    2.   <u>Standing</u>

In order to meet the "irreducible constitutional minimum" of standing, a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016) (internal quotation marks and citations omitted). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Id. at 1548 (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)). Additionally, Plaintiffs must demonstrate a "present case or controversy" with respect to claims seeking prospective, injunctive relief, City of L.A. v. Lyons, 461 U.S. 95, 102-03 (1983), and "past injuries cannot satisfy the injury-in-fact requirement" for such claims,

Vaccariello v. XM Satellite Radio, Inc., 295 F.R.D. 62, 72 (S.D.N.Y. 2013) (citing Shain v. Ellison, 356 F.3d 211, 215 (2d Cir. 2004)).

Plaintiffs may, under some circumstances, rely on the risk of a future harm to support their injury in fact, see Deshawn E. v. Safir, 156 F.3d 340, 344 (2d Cir. 1998); however, such injuries are only "actual or imminent" where "the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur."[3] Susan B. Anthony List v. Driehaus, 134 S. Ct. 2334, 2341 (2014) (quoting Clapper v. Amnesty Int'l USA, 133 S. Ct. 1138, 1147 (2013)). A plaintiff alleging only an "objectively reasonable possibility" that it will sustain the cited harm at some future time does not satisfy this requirement. Clapper, 133 S. Ct at 1147-48. For this reason, courts are generally hostile to "standing theories that require guesswork as to how independent decisionmakers will exercise their judgment," id. at 1150, which almost by definition require speculation as to the likelihood of injury resulting from the third party's actions.

Moreover, plaintiffs cannot evade the required showing of an "actual or imminent" injury by alleging present harms incurred as a result of their "fear[] of a hypothetical future harm that is not certainly impending," as doing so would allow parties to "repackage" their conjectural injury

---

[3] The Supreme Court's decision in Clapper v. Amnesty International USA emphasized that the "[t]hreatened injury must be 'certainly impending' 'to constitute injury in fact' and 'allegations of possible future injury' are not sufficient. 133 S. Ct. 1138, 1141 (2013). While the Clapper decision acknowledges certain instances in which the Court previously endorsed standing based on a "substantial risk" that the harm would occur if that underlying risk "may prompt plaintiffs to reasonably incur costs to mitigate or avoid that harm," id. at 1151 n.5, it appeared to treat those cases as an exception to the general rule. However, the Court's subsequent decision in Susan B. Anthony List v. Driehaus incorporated the "substantial risk" language into its recitation of the standard for measuring injury in fact. 134 S. Ct. 2334, 2341 (2014). At this point, it is not clear when one or the other standard should be applied, see Hedges v. Obama, 724 F.3d 170, 196 (2d Cir. 2013), or even whether those standards are distinct, see N.Y. Bankers Ass'n Inc. v. City of N.Y., No. 13-CV-7212 (KPF), 2014 WL 4435427, at *9 (S.D.N.Y. Sept. 9, 2014). While some courts have applied the potentially lower "substantial risk" analysis in assessing pre-enforcement challenges to laws, such as that considered in Susan B. Anthony List, the governing standard for actuality or imminence with regard to other types of claims is less clear. See, e.g., Hedges, 724 F.3d at 195-96; Knife Rights, Inc. v. Vance, 802 F.3d 377, 384 (2d Cir. 2015). The court need not wade into these questions in the present case. The Cohen Complaint relies wholly on possible future injuries untethered from any allegation as to the likelihood or imminence of their occurrence that are insufficient under either standard.

to "manufacture standing." Id. at 1151. Instead, the focus of the standing inquiry remains whether "the threat creating the fear is sufficiently imminent." Hedges v. Obama, 724 F.3d 170, 195 (2d Cir. 2013); see also Lyons, 461 U.S. at 107 n.8 ("It is the reality of the threat . . . that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions.").

Courts have broadly rejected claims based on the risk of falling victim to a future terrorist attack, concluding that such harms are impermissibly speculative and so insufficient to confer standing. See, e.g., Tomsha v. Gen. Servs. Admin., No. 15-CV-7326 (AJN), 2016 WL 3538380, at *2-3 (S.D.N.Y. June 21, 2016); Bernstein v. Kerry, 962 F. Supp. 2d 122, 127-28 (D.D.C. 2013); People of Colo. ex rel. Suthers v. Gonzales, 558 F. Supp. 2d 1158, 1162 (D. Colo. 2007); cf. George v. Islamic Rep. of Iran, 63 F. App'x. 917, 918 (7th Cir. 2003) (holding that plaintiffs were "no more likely than the average [] citizen to be victims of future attacks" and so their claimed injury was "purely speculative").

### 3. Application to the Cohen Complaint

The Cohen Plaintiffs fail to carry their burden of showing that their claims are grounded in some non-speculative future harm. Despite offering extensive descriptions of previous attacks (see Cohen FAC ¶¶ 11-16), the Cohen Plaintiffs do not seek redress for past actions but instead seek prospective, injunctive relief based on their allegation that Facebook's actions increase their risk of harm from future terrorist attacks (see, e.g., id. ¶¶ 5, 37). This claimed harm relies on multiple conjectural leaps, most significantly its central assumption that the Cohen Plaintiffs will be among the victims of an as-yet unknown terrorist attack by independent actors not before the court. The Cohen Complaint contains no factual allegation that could form a basis to conclude that those individuals in particular are at any "substantial" or "certainly impending" risk of future harm. Susan B. Anthony List, 134 S. Ct. at 2341. At most, the Complaint shows a general risk of harm to residents of Israel and impliedly asks the court to extract a risk of harm to the Cohen

10

Plaintiffs based on this risk. Without further allegations, however, the court sees no basis to conclude that the Cohen Plaintiffs "specifically will be the target of any future, let alone imminent, terrorist attack." Tomsha, 2016 WL 3538380, at *2.

Nor can the Cohen Plaintiffs rescue their claims by arguing that they suffer a present harm resulting from their fear of such attacks, as "allegations of a subjective [fear] are not an adequate substitute for a claim of specific present objective harm or threat of a specific future harm." Clapper, 133 S. Ct. at 1152 (quoting Laird v. Tatum, 408 U.S. 1, 13-14 (1972)). While the court does not question the sincerity of the Cohen Plaintiffs' anxieties, their subjective fears cannot confer standing absent a sufficient showing of the risk of future harm.[4]

For the foregoing reasons, the Cohen Complaint is dismissed without prejudice in its entirety. See Carter v. HealthPort Techs., LLC, 822 F.3d 47, 54-55 (2d Cir. 2016) ("[W]here a complaint is dismissed for lack of Article III standing, the dismissal must be without prejudice . . . .").

### B. Personal Jurisdiction

Facebook also argues that subjecting it to personal jurisdiction in New York as to the Force[5] claims would be inconsistent with state law requirements and due process principles.

---

[4] The Cohen Plaintiffs argue that they establish an injury in fact because "the Israeli statutes [that form the basis for some of their claims] were passed to protect the plaintiffs and impose a duty upon Facebook." (Pls. Mem. in Opp'n to MTD ("Opp'n Mem.") (Dkt. 29), No. 16-CV-4453, at 40.) Their argument appears to be that Israeli law gives rise to a cognizable injury in fact by creating a protected interest. However, the presence of a statutory right does not itself satisfy Article III's injury in fact requirement, which must be met in all cases. See Lujan, 504 U.S. at 576-78. Where, as here, the examining court finds that plaintiffs fail to establish a constitutionally cognizable injury in fact, the resulting jurisdictional defect is not remedied by the presence of a statutory right. See Spokeo, Inc. v. Robbins, 136 S. Ct. 1540, 1549 (2016) ("Article III standing requires a concrete injury even in the context of a statutory violation.").

[5] Facebook's argument against personal jurisdiction is also directed at the Cohen Complaint and raises a number of valid but vexing questions as to the interaction between New York's statutory scheme for extending jurisdiction over corporations and recent Supreme Court decisions concerning due process limitations on personal jurisdiction. (See MTD Mem. at 27-30.) Because the court has determined that the Cohen Plaintiffs fail to establish standing, it need not address the question of personal jurisdiction as to their Complaint. Cf. Ruhrgas AG, 526 U.S. at 583-84 (holding that subject matter questions may be, but are not necessarily, decided before questions of personal jurisdiction).

(See MTD Mem. at 22-30.) The court concludes that personal jurisdiction over Facebook is proper based on the Force Complaint's ATA-based claims, which permit a court to exercise jurisdiction over a defendant who has minimum contacts with the United States, and the doctrine of pendent personal jurisdiction. Accordingly, the court declines to dismiss the Force Complaint on this basis.

### 1. Legal Standard

Personal jurisdiction refers to a "court's power to exercise control over the parties." Leroy v. Great W. United Co., 443 U.S. 173, 180 (1979). "In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." Licci ex rel. Licci v. Lebanese Canadian Bank, SAL ("Licci III"), 732 F.3d 161, 167 (2d Cir. 2013) (internal quotation marks and citation omitted). "Prior to discovery, a plaintiff may defeat a motion to dismiss based on legally sufficient allegations of jurisdiction." In re Magnetic Audiotape Antitrust Litig., 334 F.3d 204, 206 (2d Cir. 2003) (citation omitted). In evaluating the sufficiency of the jurisdictional allegations, a court must "construe the pleadings and affidavits in the light most favorable to the plaintiffs, resolving all doubts in their favor." Dorchester Fin. Secs. Inc. v. Banco BRJ, S.A., 722 F.3d 81, 85 (2d Cir. 2013) (internal quotation marks and citation omitted).

Establishing personal jurisdiction over a party "requires satisfaction of three primary elements": (1) procedurally proper service of process on the defendant; (2) a statutory basis for personal jurisdiction; and (3) the exercise of jurisdiction must be consistent with "constitutional due process principles." Licci ex rel. Licci v. Lebanese Canadian Bank, SAL ("Licci I"), 673 F.3d 50, 59-60 (2d Cir. 2012). Facebook does not argue that service of process was procedurally improper, and so the court's evaluation focuses on whether the exercise of personal jurisdiction is statutorily authorized and consistent with the strictures of due process.

## 2. Statutory Basis for Personal Jurisdiction

"The available statutory bases [for asserting personal jurisdiction] are enumerated by Federal Rule of Civil Procedure 4(k)." Licci I, 673 F.3d at 59. In one of its provisions, that rule states that "[s]erving a summons or filing a waiver of service establishes personal jurisdiction over a defendant . . . when authorized by a federal statute." Fed. R. Civ. P. 4(k)(1)(C). Where a federal statute authorizes nationwide service of process, this provision permits the exercise of personal jurisdiction over parties properly served anywhere in the United States. See Kidder, Peabody & Co., Inc. v. Maxus Energy Corp., 925 F.2d 556, 562 (2d Cir. 1991) (stating nationwide service provision of the Securities Exchange Act "confers personal jurisdiction over a defendant who is served anywhere within the United States").

The Force Plaintiffs argue that the service provision of the ATA provides the statutory basis for exercising personal jurisdiction over Facebook. (Pls. Mem. in Opp'n to MTD ("Opp'n Mem.") (Dkt. 29), No. 16-CV-4453, at 7-8). In pertinent part, the relevant statute states that, for civil enforcement of federal antiterrorism statutes pursuant to 18 U.S.C. § 2333, "[p]rocess . . . may be served in any district where the defendant resides, is found, or has an agent."[6] 18 U.S.C. § 2334(a). Various opinions, including two recent decisions from this district, have held that this provision authorizes nationwide service of process and so provides personal jurisdiction over defendants who are properly served anywhere in the United States. Weiss v. Nat'l Westminster Bank PLC, 176 F. Supp. 3d 264, 284 (E.D.N.Y. 2016); Strauss v. Credit Lyonnais, S.A., 175

---

[6] Immediately before its service provision, Section 2334 states that "[a]ny civil action under section 2333 . . . may be instituted in the district court of the United States for any district where any plaintiff resides or where any defendant resides or is served, or has an agent." 18 U.S.C. § 2334(a). At least one prior opinion restricted nationwide service to instances in which this venue requirement is satisfied. See Wultz v. Islamic Rep. of Iran, 762 F. Supp. 2d 18, 25-29 (D.D.C. 2011). Facebook's apparent concession that it was properly served in the Southern District of New York prior to transfer to this court is also sufficient to establish that statutory venue was proper and so that the statutory prerequisite for nationwide service was satisfied. Cf. Wultz, 762 F. Supp. 2d at 29-30; Weiss v. Nat'l Westminster Bank PLC, 176 F. Supp. 3d 264, 284 n.10 (E.D.N.Y. 2016).

F. Supp. 3d 3, 26-27 (E.D.N.Y. 2016); see also Licci I, 673 F.3d at 59 n.8 (2d Cir. 2012) (noting the ATA's service provision as a potential basis for establishing personal jurisdiction).

Facebook does not argue that service was defective, nor does it contest the holdings in the cases cited above other than to argue that they were wrongly decided. Given the unanimity of opinion on the subject, including within the Second Circuit, and the clear language of the statute, there are no apparent grounds to disagree with Plaintiffs' position. Accordingly, the court finds that the ATA provides statutory grounds for extending personal jurisdiction over Facebook.

    3.    Due Process Considerations

Even where statutorily authorized, the exercise of personal jurisdiction must be consistent with constitutional due process requirements. See, e.g., Waldman v. Palestine Liberation Org., 835 F.3d 317, 327-28 (2d Cir. 2016). The reviewing court must satisfy itself that "maintenance of a lawsuit does not offend 'traditional notions of fair play and substantial justice.'" Id. at 328 (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)).

While the required analysis typically looks to a party's "minimum contacts" with the particular state in which the examining court sits, satisfaction of due process as to federal statutes with nationwide service provisions depends only on a party's contact with the United States as a whole. See, e.g., In re Terrorist Attacks on Sept. 11, 2001, 349 F. Supp. 2d 765, 806 (S.D.N.Y. 2005); cf. Mariash v. Morrill, 496 F.2d 1138, 1143 (2d Cir. 1974) (noting that personal jurisdiction predicated on nationwide service "remains subject to the constraints of the Due Process clause of the Fifth Amendment" (emphasis added)). The First Circuit explained the basis for this distinction, stating: "Inasmuch as the federalism concerns which hover over the jurisdictional equation in a diversity case are absent in a federal question case, a federal court's power to assert personal jurisdiction is geographically expanded." United Elec., Radio, and Mach. Workers of Am. v. 163 Pleasant St. Corp., 960 F.2d 1080, 1085 (1st Cir. 1984).

Applying this reasoning to the ATA's nationwide service provision, courts have consistently held that defendants are subject to personal jurisdiction for civil claims under that act where they have minimum contacts with the United States as a whole.[7] See Waldman, 835 F.3d at 331-334 (assessing personal jurisdiction based on defendants' contacts with the United States as a whole); Strauss, 175 F. Supp. 3d at 28; Weiss, 176 F. Supp. 3d at 285; In re Terrorist Attacks, 349 F. Supp. 2d at 810-11.

There is no question that Facebook has the required contacts with the United States as a whole. The Force Plaintiffs allege—and Facebook does not dispute—that Facebook is incorporated in Delaware and has its principal place of business in California. (Force FAC ¶ 19.) As a United States resident, Facebook could hardly argue that it lacks the required contacts with the country as a whole. Mariash, 496 F.2d at 1143 ("[W]here, as here, the defendants reside within the territorial boundaries of the United States, the 'minimal contacts,' required to justify the federal government's exercise of power over them, are present."); cf. Daimler AG v. Bauman, 134 S. Ct. 746, 760 (2014) (holding that a corporation is "fairly regarded at home" and so "amenable" to personal jurisdiction for suits relating to all of its activities, including those outside the forum, in its principal place of business and place of incorporation). Accordingly, the court finds that exercising of jurisdiction over Facebook with respect to the ATA claims comports with the requirements of due process.

---

[7] Facebook argues that the ATA cases noted here are distinguishable on the basis that they apply only to foreign defendants, a distinction they claim has legal salience because "any American defendants would have very different federalism-backed expectations than a foreign defendant about where in the United States it may be hailed into court." (Def. Reply in Further Supp. of MTD ("Reply Mem.") (Dkt. 31), No. 16-CV-4453, at 9.) However, Facebook cites no authority that supports this restriction and, though it is correct that analysis of minimum contacts and personal jurisdiction under the ATA has been limited to foreign parties, courts in this circuit have applied the same rule to US-based defendants under other laws with similar provisions. See, e.g., Local 8A-28A Welfare and 401(k) Retirement Funds v. Golden Eagles Architectural Metal Cleaning and Refinishing, 277 F. Supp. 2d 291, 294 (S.D.N.Y. 2003); Hallwood Realty Partners, L.P. v. Gotham Partners, L.P., 104 F. Supp. 2d 279, 281-87 (S.D.N.Y. 2000). Accordingly, the court finds no reasons to treat this distinction as controlling here.

4.     <u>Pendent Personal Jurisdiction</u>[8]

"A plaintiff must establish the court's jurisdiction with respect to <u>each</u> claim asserted" <u>Sunward Elec., Inc. v. McDonald</u>, 362 F.3d 17, 24 (2d Cir. 2004), and so the court is required to assess personal jurisdiction as to the Force Complaint's remaining, Israeli law-based claims.

"[U]nder the doctrine of pendent personal jurisdiction, where a federal statute authorizes nationwide service of process, and the federal and [non-federal] claims 'derive from a common nucleus of operative fact', the district court may assert personal jurisdiction over the parties to the related [] claims even if personal jurisdiction is not otherwise available." <u>IUE AFL-CIO Pension Fund v. Herrmann</u>, 9 F.3d 1049, 1056 (2d Cir. 1993) (internal quotation marks and citations omitted). A common nucleus of operative fact exists between claims where "the facts underlying the federal and [non-federal] claims substantially overlap[] [or] the federal claim necessarily [brings] the facts underlying the [non-federal] claim before the court." <u>Achtman v. Kirby, McInerney & Squire, LLP</u>, 464 F.3d 328, 335 (2d Cir. 2006) (internal quotation marks and citation omitted).

District courts have discretion as to whether to exercise pendent personal jurisdiction, the exercise of which should be informed by "considerations of juridical economy, convenience, and fairness to litigants." <u>See</u> <u>In re LIBOR-Based Fin. Instruments Antitrust Litig.</u>, No. 11-MD-2262 (NRB), 2015 WL 6243526, at *23 (S.D.N.Y. Oct. 20, 2015) (quoting <u>Oetiker v. Jurid Werke, G.m.b.H.</u>, 556 F.2d 1, 5 (D.C. Cir. 1977)).

---

[8] The Court does not address the potential state law bases for extending personal jurisdiction over the Force Plaintiffs' remaining claims, nor it is required to do so where pendent personal jurisdiction is available. <u>IUE AFL-CIO Pension Fund v. Hermann</u>, 9 F.3d 1049, 1057 (2d Cir. 1993) ("We need not reach the question whether personal jurisdiction as to the state law claims was otherwise available because the district court had personal jurisdiction over the defendants under [a statute with a nationwide service of process provision] and the state law claims derive from a common nucleus of operative facts with the federal claims.")

Those considerations strongly favor exercising pendent jurisdiction over Facebook with respect to the Force Complaint's non-ATA-based claims. The ATA and non-ATA-based claims derive from the same underlying allegations and legal theories: that Facebook's provision of "services" to Hamas assisted that organization in recruiting, organizing, facilitating, and instigating attacks, and that Facebook failed to stop this abuse of its platform. There would be no inconvenience or unfairness to Facebook in requiring it to litigate the same facts before the same court, nor would splitting up the claims between multiple courts do anything to conserve judicial resources. In view of the foregoing discussion of the ATA's nationwide service provision, the court exercises personal jurisdiction over Facebook with respect to the Force Plaintiffs' remaining claims as well.

*     *     *

Accordingly, the court concludes that Facebook is subject to personal jurisdiction in New York as to the claims asserted in the Force Complaint, and denies its motion to dismiss for lack of personal jurisdiction.

### C.     Failure to State a Claim Based on the Communications Decency Act[9]

The parties dedicate much of their briefing debating the applicability of Section 230(c)(1) of the Communications Decency Act ("Section 230(c)(1)") to the present dispute. There are two distinct species of arguments regarding Section 230(c)(1) raised in the parties' briefs. First, the parties dispute whether the asserted claims fall within the substantive coverage of Section 230(c)(1). Second, the Force Plaintiffs argue that Facebook is improperly attempting to apply Section 230(c)(1) extraterritorially. The court considers these arguments separately and

---

[9] Facebook separately seeks dismissal of the Force Complaint's federal law-based causes of action, arguing that the Force Plaintiffs fail to state a plausible claim for relief under the applicable statutes. (MTD Mem. at 32-40.) The court does not address this argument, as it concludes that all of the Force Complaint's claims must be dismissed on the basis of the Communications Decency Act.

concludes that the activity alleged falls within the immunity granted by Section 230(c)(1) and that application of that subsection to the present dispute is not impermissibly extraterritorial.

### 1. Legal Standard

The purpose of a motion to dismiss for failure to state a claim under Rule 12(b)(6) is to test the legal sufficiency of a plaintiff's claims for relief. Patane v. Clark, 508 F.3d 106, 112 (2d Cir. 2007). In reviewing a complaint on such a motion, the court must accept as true all allegations of fact, and draw all reasonable inferences in favor of the plaintiff. ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007). A complaint will survive a motion to dismiss if it contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). However, even where a claim is otherwise plausible, a defendant may move to dismiss based on an available affirmative defense, and the court may grant the motion on that basis "if the defense appears on the face of the complaint." Pani v. Empire Blue Cross Blue Shield, 152 F.3d 67, 74 (2d Cir. 1998); see also Ricci v. Teamsters Union Local 456, 781 F.3d 25, 28 (2d Cir. 2015).

### 2. Coverage of Section 230(c)(1)

#### a. *Overview of Section 230(c)(1)*

Section 230(c)(1) shields defendants who operate certain internet services from liability based on content created by a third party and published, displayed, or issued through the use of the defendant's services. That subsection states: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1).

The Second Circuit recently described the necessary components of an immunity claim under Section 230(c)(1), stating that the law "shields conduct if the defendant (1) is a provider or

18

user of an interactive computer service, (2) the claim is based on information provided by another information content provider and (3) the claim would treat [the defendant] as the publisher or speaker of that information." FTC v. LeadClick Media, LLC, 838 F.3d 158, 173 (2d Cir. 2016) (alteration in original) (internal quotation marks and citations omitted). Where a defendant establishes these requirements based on the face of a complaint, a motion to dismiss may be granted. See Ricci, 781 F.3d at 28 (citing Klayman v. Zuckerberg, 753 F.3d 1354, 1357 ("Klayman II") (D.C. Cir. 2014)).

The Force Plaintiffs do not genuinely contest that the first and second elements of this test are satisfied in the present case,[10] but rather focus their efforts on contesting the final requirement for obtaining Section 230(c)(1) immunity—that "the claim would treat [the defendant] as the publisher or speaker of" third party content. Under this prong, qualifying defendants are protected from liability predicated on their "exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone, or alter content" that they did not themselves create. LeadClick Media, 838 F.3d at 174 (internal quotation marks and citation omitted). The Second Circuit's most recent opinion on the subject provided the following guidance as to when a defendant is shielded:

> [W]hat matters is whether the cause of action inherently requires the court to treat the defendant as the "publisher or speaker" of content provided by another. To put it another way, courts must ask whether

---

[10] While the court does not engage in an extended discussion of the first two prongs here, Facebook and the content at issue qualify easily. The Second Circuit has not considered whether social media platforms in particular are "interactive computer services" within the meaning of the law; however, other courts have readily concluded that such websites (and Facebook in particular) fall into this category. See, e.g., Klayman II, 753 F.3d at 1357-58; Doe v. MySpace, Inc., 528 F.3d 413, 420-22 (5th Cir. 2008). With regard to the second prong—that the "claim is based on information provided by another content provider"—the Second Circuit has indicated that a defendant falls afoul of this requirement only where "it assisted in the development of what made the content unlawful." LeadClick Media, 838 F.3d at 174. The District Court for the District of Columbia recently rejected an argument that Facebook fell afoul of this standard by using data collected from users to suggest other content and users, stating that "the manipulation of information provided by third parties does not automatically convert interactive service providers into information content providers." Klayman v. Zuckerberg, 910 F. Supp. 2d 314, 321 n.3 ("Klayman I") (D.D.C. 2012), aff'd, 753 F.3d 1354 (D.C. Cir. 2014).

19

> the duty that the plaintiff alleges the defendant violated <u>derives from the defendant's status or conduct as a "publisher or speaker."</u>

<u>Id.</u> at 175 (quoting <u>Barnes v. Yahoo!, Inc.</u>, 570 F.3d 1096, 1102 (9th Cir. 2009)) (emphasis added). This guidance emphasizes that Section 230(c)(1) is implicated not only by claims that explicitly point to third party content but also by claims which, though artfully pleaded to avoid direct reference, implicitly require recourse to that content to establish liability or implicate a defendant's role, broadly defined, in publishing or excluding third party communications. <u>See, e.g.</u>, <u>Jane Doe No. 1 v. Backpage.com, LLC</u>, 817 F.3d 12, 19 (1st Cir. 2016) ("The ultimate question [of whether Section 230(c)(1) applies] does not depend on the form of the asserted cause of action . . . .") (collecting cases); <u>Manchanda v. Google</u>, No. 16-CV-3350 (JPO), 2016 WL 6806250, at *2 (S.D.N.Y. Nov. 16, 2016).

In keeping with this expansive view of the publisher's role, judicial decisions in the area consistently stress that decisions as to whether existing content should be removed from a website fall within the editorial prerogative. <u>See</u> <u>Ricci</u>, 781 F.3d at 28; <u>Klayman II</u>, 753 F.3d at 1359; <u>Green v. Am. Online (AOL)</u>, 318 F.3d 465, 471 (3d Cir. 2003) ("[D]ecisions relating to the monitoring, screening, and deletion of content from [defendant's] network . . . quintessentially relate[] to a publisher's role."); <u>Barnes</u>, 570 F.3d at 1103 ("[R]emoving content is something publishers do."). Similarly, a recent opinion found that decisions as to the "structure and operation" of a website also fall within Section 230(c)(1)'s protection, <u>Backpage.com</u>, 817 F.3d at 21, a determination which one court extended to a social media platform's decisions as to who may obtain an account, <u>see</u> <u>Fields v. Twitter</u>, -- F. Supp. 3d --, No. 16-CV-213, 2016 WL 6822065, at *6 ("<u>Fields II</u>") (N.D. Cal. Nov. 18, 2016).

### b.    *Application*

While the Force Plaintiffs attempt to cast their claims as content-neutral, even the most

generous reading of their allegations places them squarely within the coverage of Section

230(c)(1)'s grant of immunity.  In their opposition to the present motion, the Force Plaintiffs

argue that their claims seek to hold Facebook liable for "provision of services" to Hamas in the

form of account access "coupled with Facebook's refusal to use available resources . . . to

identify and shut down Hamas [] accounts."  (Opp'n Mem. at 27; see also Force FAC

¶¶ 543-55.)  While superficially content-neutral, this attempt to draw a narrow distinction

between policing accounts and policing content must ultimately be rejected.  Facebook's choices

as to who may use its platform are inherently bound up in its decisions as to what may be said on

its platform, and so liability imposed based on its failure to remove users would equally "derive[]

from [Facebook's] status or conduct as a 'publisher or speaker.'"  LeadClick Media, 838 F.3d

at 175 (internal quotation marks and citations omitted).  Section 230(c)(1) prevents courts from

entertaining civil actions[11] that seek to impose liability on defendants like Facebook for allowing

third parties to post offensive or harmful content or failing to remove such content once posted.

See Ricci, 781 F.3d at 28; Klayman II, 753 F.3d at 1359 ("[T]he very essence of publishing is

making the decision whether to print or retract a given piece of content.").  For the same reason,

it is clear that Section 230(c)(1) prevents the necessarily antecedent editorial decision to allow

---

[11] The Force Plaintiffs also refer in passing to a subsection of Section 230 which states that "[n]othing in this section shall be construed to impair the enforcement of . . . any [] Federal criminal statute." 47 U.S.C. § 230(e)(1). (Opp'n Mem. at 26-27.)  While, read most favorably, this section could be interpreted to inhibit immunity as to civil liability predicated on federal criminal statutes, such as the ATA provisions at issue here, this reading has been rejected by most courts that have examined it. See Backpage.com, 817 F.3d at 23; M.A. ex rel P.K. v. Vill. Voice Media Holdings, LLC, 809 F. Supp. 2d 1041, 1054-55 (E.D. Mo. 2011); Doe v. Bates, No. 5:05-CV-91, 2006 WL 3813758, at *3-4 (E.D. Tex. Dec. 27, 2006); Obado v. Magedson, No. 13-cv-2382, 2014 WL 3778261 (D.N.J. July 31, 2014); but see Nieman v. Versuslaw, Inc., No.12-3104, 2012 WL 3201931, at *9 (C.D. Ill. Aug. 3, 2012).  The court concludes that this subsection does not limit Section 230(c)(1) immunity in civil actions based on criminal statutes but rather extends only to criminal prosecutions.

certain parties to post on a given platform, as that decision cannot be meaningfully separated from "choices about what [third party] content can appear on [the platform] and in what form." Fields II, 2016 WL 6822065, at *6 (quoting Backpage.com, 817 F.3d at 20-21).

Further, it is clear that the Force Plaintiffs' claims are not based solely on the provision of accounts to Hamas but rely on content to establish causation and, by extension, Facebook's liability. The essence of the Force Complaint is not that Plaintiffs were harmed by Hamas's ability to obtain Facebook accounts but rather by its use of Facebook for, inter alia, "recruiting, gathering information, planning, inciting, [] giving instructions for terror attacks, . . . issu[ing] terroristic threats, . . . [and] intimidating and coerc[ing] civilian populations." (Force FAC ¶ 112; see also Opp'n Mem. at 29 ("[P]laintiffs have alleged how Facebook's provision of services and resources to Hamas substantially contributed to Hamas's ability to carry out the attacks at issue and the attacks were a foreseeable consequence of the support provided by Facebook.") Said differently, the Force Plaintiffs claim that Facebook contributed to their harm by allowing Hamas to use its platform to post particular offensive content that incited or encouraged those attacks. Facebook's role in publishing that content is thus an essential causal element of the claims in the Force Complaint, and allowing liability to be imposed on that basis would "inherently require[] the court to treat the defendant as the publisher or speaker of content provided by" Hamas. LeadClick Media, 838 F.3d at 175 (internal quotation marks and citations omitted); see also Fields II, 2016 WL 6822065, at *7 ("Although plaintiffs have carefully restructured their [complaint] to focus on their provision of accounts theory of liability, at their core, plaintiffs' allegations are still that [the social media platform] failed to prevent [terrorists] from disseminating content through [its] platform, not its mere provision of accounts . . . .").

Accordingly, the court finds that the Force Plaintiffs' claims against Facebook fall within the scope of Section 230(c)(1)'s grant of immunity. The court proceeds to consider whether that statute may be applied to the present dispute.

### 3. Extraterritorial Application of the Communications Decency Act

Separate from its substantive scope, the Force Plaintiffs argue that Section 230(c)(1) does not apply to the present dispute because, under the presumption against extraterritoriality, it cannot be applied to conduct that occurs wholly outside of the United States. (See Opp'n Mem. at 30-31.) Pointing to recent Supreme Court holdings, Plaintiffs claim that because "the CDA 'gives no clear indication of an extraterritorial application,' under [Morrison v. Nat'l Austl. Bank Ltd., 561 U.S 247 (2010)], the CDA has no extraterritorial application." (Id. at 31.)

#### a. Overview of the Presumption against Extraterritoriality

Based on the premise that "United States law governs domestically but does not rule the world," the presumption against extraterritoriality dictates that statutes should only be given domestic effect absent a definitive demonstration of Congress's intent for them to apply abroad. See RJR Nabisco, Inc. v. European Cmty., 136 S. Ct. 2090, 2100 (2016) (internal quotation marks and citations omitted). While "the presumption against extraterritoriality is 'typically' applied to statutes 'regulating conduct,'" id. at 2100 (quoting Kiobel v. Royal Dutch Petroleum, 133 S. Ct. 1659, 1664 (2013)), the Supreme Court recently clarified that, "regardless of whether the statute in question regulates conduct, affords relief, or merely confers jurisdiction," all questions of extraterritoriality should be assessed using a "two-step framework," id. at 2101.

The first step requires the court to determine "whether the statute gives a clear, affirmative indication that it applies extraterritorially." Id. The presumption against extraterritoriality does not apply if a statute contains an express demonstration of Congress's intent that the law should apply abroad. See Morrison, 561 U.S. at 255. Conversely, absent

23

evidence of such intent, the statute can only be applied domestically. Id. ("[W]hen a statute gives no clear indication of extraterritorial application, it has none.")

If a statute lacks clear indicia of intended extraterritorial effect, the examining court must then "determine whether the case at issue involves [] a prohibited [extraterritorial] application" of the law. Matter of Warrant to Search a Certain E-Mail Account Controlled and Maintained by Microsoft Corp. ("Microsoft Corp."), 829 F.3d 197, 216 (2d Cir. 2016). Accomplishing this step requires the court to identify the "focus" of the statute, defined as the "objects of the statute's solicitude." Morrison, 561 U.S. at 267. From this, the court must distill the relevant "territorial events or relationships" that bear on that "focus," see Microsoft Corp. at 216 (internal citation omitted), separating those events whose location is relevant to the statute's central emphasis from those that are peripheral. The final element of this analysis requires the court to assess whether the relevant "territorial events and relationships" occurred domestically or abroad with respect to the challenged application of the statute. Id. If, in the final analysis, the court determines that "the domestic contacts presented by the case fall within the 'focus' of the statutory provision or are 'the objects of the statute's solicitude,' then the application of the provision is not unlawfully extraterritorial." Id. (quoting Morrison, 561 U.S. at 267).

        *b.*      *Application to Section 230(c)(1)*

           i.    Indicia of Section 230(c)(1)'s Intended Extraterritorial Effect

No other court appears to have addressed the presumption against extraterritoriality in the context of a statute which limits liability or imparts immunity. At the outset, the court agrees with the Force Plaintiffs that the statute itself lacks an "affirmative indication that it applies extraterritorially," RJR Nabisco, 136 S. Ct. at 2101, as none of Section 230(c)(1), the surrounding provisions, or any other section of the Communications Decency Act demonstrate

any clear consideration of such application, see Communications Decency Act of 1996, Pub. L. No. 104-104, 110 Stat. 56, §§ 501-61 (codified in scattered sections of Title 18 and Title 47 of the United States Code).

ii.     <u>Determining the Statutory "Focus"</u>

Moving on to find the statute's "focus," the court concludes that the "object[] of [Section 230(c)(1)'s] solicitude" is its limitation on liability. <u>Morrison</u>, 561 U.S. at 267. In drawing this conclusion, the court turns "to the familiar tools of statutory interpretation," <u>Microsoft Corp.</u>, 829 F.3d at 217, determining the relevant provision's focus by examining its text and context.

Looking first to the plain language of Section 230(c)(1), the court concludes that the "most natural reading of [that provision] . . . suggests a legislative focus on" providing immunity. <u>Id.</u> Section 230(c)(1) offers only one directive—that qualifying defendants may not be treated as the "publisher or speaker of <u>any</u>" third party content—which it does not cabin based on either the location of the content provider or the user or provider of the interactive computer service. 47 U.S.C. § 230(c)(1). This emphasis on immunity over other considerations is clear from the text, and courts interpreting that provision have consistently found Section 230(c)(1)'s plain language focuses on protecting qualified defendants from civil suits. <u>See, e.g.</u>, <u>Zeran v. Am. Online, Inc.</u>, 129 F.3d 327, 330 (4th Cir. 1997).

Viewing the relevant language in the context of the surrounding provisions and the policy goals of that section further supports this view of its "focus." Other than the relevant provision, Section 230 contains only two other substantive provisions, one of which is similarly explicit in

25

limiting civil liability for providers and users of interactive computer services.[12] 47 U.S.C.

§ 230(c)(2). Both of these immunizing provisions were adopted specifically for the purpose of

clarifying—and curtailing—the scope of internet-providing defendants' exposure to liability

predicated on third party content,[13] and much of the surrounding statutory language emphasizes

and supports this focus. This is evidenced, for instance, by Section 230's stated purpose of

preserving an open and free internet uninhibited by external limitations, see 47 U.S.C.

§ 230(b)(2), and its listed exceptions to the broad liability provided therein, see id. § 230(e).

> iii.  Ascertaining the Relevant "Territorial Events and Relationships"

In light of its focus on limiting civil liability, the court concludes that the relevant

location is that where the grant of immunity is applied, i.e. the situs of the litigation. Section

230(c)(1) suggests a number of "territorial relationships and events," which are generally

divisible into those associated with the underlying claim (e.g., the location of the information

content provider, the internet service provider, or the act of publishing or speaking) and the

location associated with the imposition of liability, i.e. where the internet service provider is to

---

[12] Section 230 also requires interactive computer service providers to provide notice to customers of commercially available parental control products that allow for content limitations. 47 U.S.C. § 230(d).

[13] Notes of debates around the adoption of the precise language at issue demonstrate that Congress acted with the purpose of limiting liability. See H.R. Rep. No. 104–458, at 194 (1996) (H.R. Conf. Rep.), reprinted in 1996 U.S.C.C.A.N. 10. The court observes, however, that the legislative intent is not unequivocal in this regard. The provision at issue was adopted in response to a New York case, Stratton Oakmont, Inc. v. Prodigy Servs. Co., 1995 WL 323710 (N.Y. Sup. Ct. May 24, 1995), which held an internet service provider liable for the comments by its users, concluding that the service provider became a "publisher" by virtue of having selectively removed content and so was subject to liability for republishing defamatory comments that it had not removed. Id. at *3-4. In overruling that decision, Congress evidently sought to remove disincentives to selective removal of material created by that opinion, which it concluded would impair "the important federal policy of empowering parents to determine the content of communications their children receive through interactive computer service." H.R. Rep. No. 104–458 at 194. Some opinions have noted that the subsequent interpretation of the law, which arguably undermines information service providers' incentives to remove any information by inculcating them against liability for the content they display, overreads the protections that Congress sought to provide. See Chi. Lawyers' Comm. for Civil Rights Under Law, Inc. v. craigslist, Inc., 519 F.3d 666, 669-70 (7th Cir. 2008). Whatever the merits of that argument, for present purposes it is relevant only to show that Congress's "focus" in including the relevant language was on limiting liability, not its reasons for adopting that policy.

be "treated" as the publisher or speaker. Given the statutory focus on limiting liability, however, the location of the relevant "territorial events" or "relationships" cannot be the place in which the claims arise but instead must be where redress is sought and immunity is needed.

With this in mind, the court concludes that the Force Action does not require an impermissible extraterritorial application of Section 230(c)(1). As the situs of the litigation is New York, the relevant "territorial events or relationships" occur domestically. Accordingly, the court rejects the Force Plaintiff's argument that Facebook should be denied immunity under Section 230(c)(1).[14]

\*     \*     \*

Accordingly, the court grants Facebook's motion to dismiss all claims in the Force Complaint for failure to state a claim upon which relief can be granted.

---

[14] The Force Plaintiffs separately claim that Section 230(c)(1) does not apply to claims based in foreign law (Opp'n Mem. at 31), and argue that their Israeli tort law claims are properly before the court under a conflict of laws analysis (id. at 31-36). Their argument that the Communications Decency Act does not limit Israeli law claims is apparently based on lack of any reference to foreign law in the Section 230's subsection entitled "Effect on other laws." 47 U.S.C. § 230(e). The relevant subsection provides a limited list of exceptions to Section 230(c)'s limitations on liability. See, e.g., id §§ 230(e)(1) (stating that the liability provisions do not impair enforcement of federal criminal laws), 230(e)(3) (stating that Section 230 does not affect state laws that are "consistent with this section"). The Force Plaintiffs argue that failing to include foreign law in this section indicates that Section 230(c)(1)'s grant of immunity does not apply to Israeli law-based claims. The court disagrees and understands the significance of this omission to be just the opposite: because there is no listed exception for foreign law claims, those claims remain subject to the limitations on liability provided by Section 230(c)(1). Cf. TRW Inc. v. Andrews, 534 U.S. 19, 28 (2001) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." (internal quotation marks and citations omitted)).

## IV.  CONCLUSION

For the foregoing reasons, Facebook's Motions to Dismiss ((Dkt. 23), No. 16-CV-4453;

(Dkt. 34), No. 16-CV-5158) are GRANTED.  The Amended Complaint in the Cohen Action

(Dkt. 17), No. 16-CV-4453) is DISMISSED WITHOUT PREJUDICE.  The Amended

Complaint in the Force Action ((Dkt. 28), No. 16-CV-5158) is DISMISSED WITHOUT

PREJUDICE.  The Clerk of Court is respectfully DIRECTED to enter judgment accordingly.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York       NICHOLAS G. GARAUFIS
       May 18 , 2017          United States District Judge